# EXHIBIT A

Electronically FILED by Superior Court of California, County of Riverside on 03/04/2026 49:36 AM
Case Number CVPS2601396 0000159492247 - Jason B. Galkin, Executive Officer/Clerk of the Court By Victoria Lopez, Clerk

**Luna D'Sol**

Plaintiff, In Pro Per

Email Address: jravada@icloud.com

2275 E Belding Dr

Palm Springs CA 92262

Telephone: 213-925-4069

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF RIVERSIDE**

| | |
|---|---|
| LUNA D'SOL | ) Case No:  **CVPS2601396** |
| Plaintiff, | ) **COMPLAINT FOR DAMAGES AND** |
| vs. | ) **EQUITABLE RELIEF** |
| BANK OF AMERICA, N.A.; | )          [Unlimited Jurisdiction] |
| BANK OF AMERICA CORPORATION; | )          **DEMAND FOR JURY TRIAL** |
| TRICIA SHANKS, an individual; | ) • DISCRIMINATON IN VIOLATION OF THE FEHA; |
| PETER C MAXIM, an individual; | ) • HOSTILE WORK ENVIRONMENT HARASSMENT IN VIOLATION OF THE FEHA; |
| and DOES 1 through 50, inclusive, | ) • RETALIATION IN VIOLATION OF THE FEHA |
| Defendants. | ) • FAILURE TO ACCOMMODATE A DISABILITY IN VIOLATION OF THE FEHA; |
| | ) • Failure to Pay Final Wages and Issuance of Inaccurate Wage Statements |
| | ) • FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS |
| | ) • Aiding and Abetting Discrimination, Harassment, and Retaliation |
| | ) • FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, OR RETALIATION |
| | • WRONGFUL TERMINATION OF EMPLOYMENT IN VIOLATION OF PUBLIC POLICY |

- 1 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiff, LUNA D'SOL, alleges, on the basis of personal knowledge and/or information and belief:

**I**

**INTRODUCTION**

**1.** Plaintiff brings this civil action against BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; TRICIA SHANKS; PETER MAXIM; and DOES 1 through 50, inclusive (collectively, "Defendants") for, but not limited to, unlawful discrimination, harassment, retaliation, and related statutory and common law violations arising from Plaintiff's employment and termination. Plaintiff seeks economic and non-economic damages, punitive damages pursuant to Civil Code section 3294, statutory penalties, equitable and injunctive relief, costs, and reasonable attorneys' fees pursuant to Government Code section 12965. This action arises from Defendants' discrimination and retaliation against Plaintiff based on gender identity, gender expression, transgender status, and age, in violation of the California Fair Employment and Housing Act (Gov. Code §§ 12920, 12940 et seq.), including subdivisions (a), (h), (i), (j), (k), (m), and (n); retaliation under Labor Code sections 98.6 and 1102.5; failure to pay wages due upon discharge and issuance of inaccurate wage statements in violation of Labor Code sections 201, 203, and 226; and wrongful termination in violation of fundamental public policy. Plaintiff further seeks relief under Civil Code sections 52.1 and 3294, Code of Civil Procedure section 1021.5, and all other applicable statutory and equitable provisions.

**II**

**PARTIES**

**2.** **PLAINTIFF LUNA D'SOL ("PLAINTIFF")** is an individual residing in Palm Springs, California, within the County of Riverside.

**3.** **DEFENDANT BANK OF AMERICA, N.A. ("THE BANK")** is a national banking association organized under the laws of the United States, with its principal place of business in Charlotte, North Carolina. At all relevant times, THE BANK employed PLAINTIFF within the meaning of the California Fair Employment and Housing Act ("FEHA") (Gov. Code § 12926(d)) and the California Family Rights Act ("CFRA") (Gov. Code § 12945.2), exercised control over the terms and conditions of her employment and made the employment decisions challenged herein.

- 2 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**4.    DEFENDANT BANK OF AMERICA CORPORAT**ION is the parent entity of BANK OF AMERICA, N.A. and, at all relevant times, operated as part of an integrated enterprise with centralized control over labor relations, human resources policies, and employment decisions affecting PLAINTIFF. Accordingly, BANK OF AMERICA CORPORATION is liable as an employer and/or joint employer under FEHA and CFRA.

**5.    DEFENDANT TRICIA SHANKS ("SHANKS")** is an individual residing in or near Newark, Delaware. At all relevant times, SHANKS was employed by THE BANK as Senior Vice President, Sr. Testing Manager, and served as PLAINTIFF's direct manager, superior in the chain of command to DEFENDANT MAXIM. SHANKS is named in her individual capacity for harassment under Government Code section 12940(j) and for aiding and abetting unlawful employment practices under Government Code section 12940(i). The conduct by SHANKS, as more fully alleged herein, was not routine personnel management but a sustained course of hostile action directed at PLAINTIFF following her disclosure of her transgender status.

**6.    DEFENDANT PETER MAXIM ("MAXIM")** is an individual residing in Woodland Hills, California — less than two miles from PLAINTIFF's secondary residence and within three miles of the designated office location cited by THE BANK as the geographic basis for PLAINTIFF's termination. At all relevant times, MAXIM served as PLAINTIFF's direct supervisor. MAXIM is named in his individual capacity for harassment under Government Code section 12940(j) and for aiding and abetting unlawful employment practices under Government Code section 12940(i). The conduct by MAXIM, as more fully alleged herein, was not routine personnel management but individually directed hostile action following PLAINTIFF's disclosure of her transgender status.

**7.    All** defendants compelled, coerced, aided, and/or abetted the discrimination, retaliation, and harassment alleged in this Complaint, which conduct is prohibited under California Government Code section 12940(i). All defendants were responsible for the events and damages alleged herein, including on the following bases: (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times,

- 3 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

there existed a unity of ownership and interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist. Adherence to the fiction of the separate existence of defendants would permit abuse of the corporate privilege and would sanction fraud and promote injustice. All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during employment with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all other defendants.

**8.**    Defendants both directly and indirectly employed PLAINTIFF as defined in the Fair Employment and Housing Act ("FEHA") at Government Code section 12926(d).

**9.**    In addition, defendants compelled, coerced, aided, and abetted the discrimination, which is prohibited under California Government Code section 12940(i).

**10.**    Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

**11.**    PLAINTIFF is informed and believes, and thereon alleges, that at all relevant times, each DEFENDANT was the agent, servant, employee, partner, joint venturer, alter ego, or co-conspirator of each of the remaining DEFENDANTS and, in doing the acts alleged herein, was acting within the course and scope of such agency, service, employment, partnership, joint venture, or conspiracy, and with the permission, knowledge, and consent of each of the remaining DEFENDANTS.

**III**

**JURISDICTION AND VENUE**

**12.**    The actions at issue in this case occurred in the State of California, in the County of Riverside. Under the California Fair Employment and Housing Act, this case can alternatively, at Plaintiff's choice, be filed:[I]n a county in which the department has an office, ***in a county in which unlawful practices are alleged to have been committed***, in the county in which records relevant to the alleged unlawful practices are maintained and administered, in the county in which the person claiming to be aggrieved would have worked or would have had access to public accommodation, but for the alleged unlawful practices, in the

- 4 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

county of the defendant's residence or principal office. . . (Italics and bolding added) (California Government Code § 12965(b).)

13.     "[I]n the absence of an affirmative showing to the contrary, the presumption is that the county in which the title of the actions shows that the case is brought is, prima facie, the proper county for the commencement and trial of the action." (*Mission Imports, Inc. v. Superior Court* (1982) 31 Cal.3d 921, 928.) The FEHA venue statute – section 12965(b) – thus affords a wide choice of venue to persons who bring actions under FEHA. (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 486.) "[T]he special provisions of the FEHA venue statute control in cases involving FEHA claims joined with non-FEHA claims arising from the same facts." (*Id*. at 487.)

14.     The amount in controversy exceeds $35,000, exclusive of interest and costs.

IV

**FACTUAL ALLEGATIONS**

15.     **HIRING:** PLAINTIFF, a 40-yeard old transgender female, was employed by THE BANK from March 31, 2006

16.     **JOB PERFORMANCE:**

   a. **On January 16th, 2025**, weeks before PLAINTIFF's protected disclosure, PLAINTIFF received her annual performance evaluation covering the 2024 performance cycle. The evaluation rated PLAINTIFF as a "**solid performer**," and able to "**increase her workload month over month**," "**learned additional testing in relation to peers**", "**assisted in E2E Complaints Initiative**" and confirmed that she "**consistently completed all testing assignments**." The evaluation was delivered by DEFENDANT MAXIM, with DEFENDANT SHANKS present.

   b. **On January 31, 2025**, SHANKS sent PLAINTIFF an email—copying MAXIM—confirming that PLAINTIFF's participation in **E2E Complaints initiative** was approved: 'this is a Go!

   c. On or about **February 19, 2025,** DEFENDANTS MAXIM and SHANKS publicly recognized PLAINTIFF during a team meeting for her assistance with the **E2E Complaints** testing initiative. This recognition occurred approximately one week before PLAINTIFF disclosed her gender transition.

17.     **PROTECTED STATUS:**

   a. PLAINTIFF is a transgender woman,

- 5 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

b. During her employment, Plaintiff engaged in protected activity, including raising complaints regarding unlawful discrimination and retaliation.

18.    **EMPLOYMENT STATUS:** PLAINTIFF was notified that her employment had been terminated on May 21, 2025. The Bank subsequently issued revised documentation reflecting different termination decision dates and effective dates, without providing any explanation for the revisions.

19.    **ADVERSE ACTIONS:**

a. On or about February 26, 2025, Plaintiff disclosed her gender transition and related medical needs to Defendants SHANKS and MAXIM. Prior to this disclosure, Plaintiff's employment record was unequivocally positive. She had recently received a favorable annual performance evaluation, written confirmation approving her participation in the End-to-End Complaints Initiative, and public commendation for her contributions. At no time before her protected disclosure had Plaintiff been disciplined, counseled, criticized, or placed on any form of performance notice. There was no documented concern regarding her work, conduct, availability, or professional standing. Immediately following Plaintiff's disclosure, however, the treatment she received changed in a manner that was both abrupt and unmistakable. Communications that had previously been collegial and collaborative became curt, transactional, and detached. Access to workstreams narrowed. Engagement decreased. Plaintiff was treated not as a valued contributor, but as a peripheral and scrutinized employee. The shift was not gradual or performance-based; it followed directly on the heels of her protected disclosure. The temporal proximity between Plaintiff's disclosure and the deterioration of her treatment was immediate and undeniable, giving rise to a reasonable inference that Defendants' conduct was motivated by **identity bias and discriminatory animus toward Plaintiff's transgender status**.

b. Within days of Plaintiff's February 26 disclosure, SHANKS and MAXIM behaved in this hostile and invalidating manner despite their knowledge of Plaintiffs health issues. SHANKS and MAXIM abruptly revoked Plaintiff's participation in the End-to-End Complaints Initiative—the very assignment SHANKS had approved in writing less than four weeks earlier and MAXIM publicly praised just seven days before. MAXIM refused to provide a response and SHANKS offered a single justification: that the Complaints team was "caught up." That explanation was

- 6 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

demonstrably false. Contemporaneous requests from the same Complaints team for additional testing support contradicted SHANKS's stated reason. No performance deficiency was cited. No business restructuring was announced. No other team member was similarly removed. The written approval had not been rescinded or modified before the disclosure. The public praise had not been qualified or retracted. The reversal came without warning, without documentation, and without any intervening event other than Plaintiff's protected disclosure. Plaintiff understood, as any reasonable employee would, that her disclosure had cost her the assignment and that her standing within the organization had fundamentally changed.

c.  On or about March 28, 2025, MAXIM sent Plaintiff a message implying that she had not been working or responding to communications. Plaintiff immediately responded, confirming that she was logged in and actively performing her duties. MAXIM then admitted, "I'm off today"— meaning he was not logged into the system and had no basis to verify Plaintiff's work status before casting the accusation. The insinuation was baseless. An employee with Plaintiff's documented performance record—publicly praised weeks earlier—was accused of failing to work by a supervisor who, by his own admission, had no factual basis for the claim. Plaintiff had never before been subjected to such monitoring or suspicion. The incident reinforced what was becoming unmistakable: following her disclosure, she was being watched, questioned, and doubted in ways she had never experienced during nearly nineteen years of employment.

d.  On April 23, 2025, SHANKS announced new testing opportunities and instructed interested employees to contact MAXIM. Plaintiff promptly expressed interest. MAXIM did not respond. He offered no explanation. He provided no feedback. He communicated no operational reason for the silence. Meanwhile, assignments continued to be distributed to other team members. Plaintiff—who weeks earlier had been formally recognized for expanding her workload and delivering competent performance—was shut out. The silence was conspicuous. It was materially different from the patterns of inclusion that had characterized her professional life before February 26. The exclusion deprived Plaintiff of development opportunities that had been available to her before her protected disclosure and signaled, in terms that required no words, that she was no longer welcome to participate.

- 7 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

e. On April 30, 2025, a system outage affected month-end evaluations across the team. Plaintiff had completed her assigned workload. Other team members had not. Despite this, MAXIM released every other employee for the day and directed Plaintiff—alone—to remain logged in after regular working hours, pending system restoration. Plaintiff complied without objection. When the system resumed and Plaintiff notified MAXIM that she was available to assist, MAXIM did not assign work. Instead, he responded with a profane and dismissive remark. He then instructed Plaintiff to log off. No further explanation was given. The directive requiring Plaintiff alone to remain online—while every other team member went home—followed by profanity and dismissal once she complied, served no legitimate business purpose. It was unnecessary, disproportionate, and degrading. As an employee managing a serious medical condition that had been disclosed to management, the hostility intensified Plaintiff's stress, anxiety, and psychiatric symptoms. The cumulative conduct described above—removal of approved assignments, baseless accusations, deliberate exclusion from opportunities, isolation during a team-wide event, and profane dismissal—occurred in close temporal proximity to Plaintiff's protected disclosure and constitutes adverse employment action contributing to a hostile and retaliatory work environment.

20. **TERMINATION AND RETALIATORY DISCHARGE:**

a. On May 21, 2025, Plaintiff called Human Resources to request paid-time-off. The Bank approved it and provided continued normal compensation through its regular payroll process from the Bank's general assets.

b. At approximately 10:35 a.m. that same day, Plaintiff notified Defendant SHANKS that Human Resources had approved her absence and that she would not be working that day. Rather than acknowledging Plaintiff's medically approved absence, SHANKS immediately began pressing Plaintiff to participate in work-related discussions and attend a meeting. SHANKS pressured Plaintiff to engage in substantive work-related meetings with 'Lauren,' a party with whom Plaintiff had no prior professional relationship. The only time Plaintiff had seen that name was when SHANKS, responding to Plaintiff's February 26 gender transition disclosure, copied "Lauren Reed" on the acknowledgment. No one had told Plaintiff that Lauren was involved in an investigation, reviewing performance, or serving any identified function. The request for a meeting

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

was immediate, vague, and unsupported by any written explanation. No specific subject matter was identified. No allegation of misconduct was stated. No performance concern was cited. SHANKS persisted despite knowing that Plaintiff was protected by the FEHA.

c. On May 21, 2025, at 12:47 p.m.—approximately two hours after SHANKS had been pressing Plaintiff to engage—Plaintiff received an email from Loren Reed and SHANKS. The subject line referenced Plaintiff's employment separation and identified her exclusively by her former male name, notwithstanding Defendants' knowledge of her gender transition. The body of the email contained no substantive explanation, no statement of reasons, no reference to any performance issue, investigation, or disciplinary basis. It contained only a secure electronic link requiring affirmative action to access. No readable document was attached. No PDF was enclosed. No written explanation accompanied the link. It told her only, by its subject line and its silence, that she was being separated from the institution she had served for nearly nineteen years—and that even in that act, Defendants used her deadname. Plaintiff did not open the secure link. She understood that accessing the link could be construed as acknowledgment of, or acquiescence to, the terms contained within it, and she was unwilling to waive or compromise any rights without first reviewing the substance of what was being proposed. Plaintiff responded in writing, advising Reed and SHANKS that she would not access any secure link and requesting that a readable copy of the document—in standard PDF format—be provided to her directly. Plaintiff made clear that her review of any documentation would not constitute acceptance, acknowledgment, or waiver of any rights. No readable copy was immediately provided. No one addressed Plaintiff's concern.. The Bank's first communication regarding Plaintiff's termination was an opaque link, addressed to her deadname, with no explanation attached. When Plaintiff subsequently placed Defendants on formal notice that she disputed the termination and the circumstances surrounding it, Defendant SHANKS responded not with clarification, documentation, or justification, but with a single directive: return the company laptop and equipment.

d. On May 23, 2025, Defendant SHANKS transmitted an email to Plaintiff containing instructions for the return of Bank of America equipment. The email included a secure electronic link. Plaintiff again declined to open it. As with the May 21 communication, Plaintiff refused to access any Bank-

- 9 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

controlled electronic portal until she had first established in writing that doing so would not constitute agreement, acceptance, or waiver of any legal rights. She had received no response to her prior objections. No one had provided a substantive explanation for her termination. On May 28, 2025, Plaintiff sent a written communication to SHANKS and Reed. She confirmed receipt of the equipment return instructions and advised that she had accessed the secure link only that day— and only after first transmitting a separate written statement establishing that opening any secure link did not constitute agreement, acceptance, or waiver of any rights under applicable state or federal law. Plaintiff stated unequivocally that any return of equipment was made solely to comply with Defendants' logistical request and did not constitute acceptance of termination, acceptance of any proposed terms, or acknowledgment of the validity of Defendants' stated basis for separation. Plaintiff expressly reserved all rights. No one from THE BANK responded to Plaintiff's reservation of rights. No one acknowledged her legal position. No one addressed her dispute of the termination. In the seven days since transmitting a termination email to a woman with a serious medical condition, THE BANK's sole communication with Plaintiff concerned the recovery of a laptop. It had nothing to say about the nineteen years of service it had just discarded, or the statutory rights it had just violated.

e.  When Plaintiff was ultimately able to review the substance of the termination documentation, it stated that as of May 21, 2025, THE BANK had decided to eliminate her position as part of a "group termination" affecting employees who did not reside in proximity to designated office locations. That explanation was false on its face. Plaintiff maintained a secondary residence within approximately three miles of the designated office location. Both SHANKS and MAXIM were aware of this; Plaintiff had discussed her secondary residence with them during the course of her employment. Defendant MAXIM himself resided in Woodland Hills, California—less than two miles from Plaintiff's secondary residence and within the same geographic radius of the designated office. MAXIM worked remotely, under the same operational and structural conditions that THE BANK cited as the basis for Plaintiff's separation. MAXIM was not terminated. He was retained and reassigned. He now reports to Loren Reed—the same individual who first appeared in Plaintiff's employment record on the day of her gender transition disclosure and who co-

- 10 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

transmitted the termination communication on May 21, 2025. No concern regarding Plaintiff's geographic eligibility had ever been raised—not in her January 2025 performance evaluation, not in the January 31 assignment approval, not in the February 19 public recognition, not in any communication at any point during her nearly twenty years of employment—until after her protected disclosures. The geographic criterion materialized only after Plaintiff disclosed her transgender status and medical needs. It was then applied to terminate Plaintiff while exempting the male, non-transgender, non-disabled supervisor who lived less than two miles away under identical remote working conditions.

f.  *Then came the revisions*. On or about June 17, 2025, at 12:18 a.m., Plaintiff received a DocuSign notification from THE BANK voiding the original termination letter—the very document that SHANKS and Reed had transmitted on May 21. No explanation was provided for the voiding. No one contacted Plaintiff. No one informed her why the documents she had been pressured to review were now being withdrawn in the middle of the night. Approximately two hours later, at 2:15 a.m., THE BANK issued a revised termination letter stating that the decision to terminate Plaintiff's employment had been made as of June 16, 2025—not May 21, 2025, as originally represented—and that Plaintiff's employment would end effective June 20, 2025. The documents again characterized the action as a "group termination" and again addressed Plaintiff by her former male name. All of this compounded Plaintiff's existing psychiatric distress and materially worsened her physician-documented medical condition. Plaintiff, who was facing a serious health condition exacerbated by Defendants' prior conduct, was now confronted with the reality that the institution she had served for nearly twenty years could not produce a consistent account of when or why it had decided to end her employment. The instability, confusion, and institutional dishonesty reflected in these communications deepened Plaintiff's anxiety, disrupted her course of medical treatment, and reinforced her reasonable belief that the termination was not the product of a legitimate business decision but was instead motivated by **discriminatory animus toward Plaintiff's gender identity and protected status**.

21.  **Irreconcilable Employment Chronology**. On June 17, 2025 at 12:18 a.m., THE BANK voided the May 21, 2025, termination letter. At 2:15 a.m., it issued a revised document stating that the decision

- 11 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

to terminate Plaintiff's employment had instead been made as of June 16, 2025, with an effective termination date of June 20. 2025. The final paycheck issued June 23, 2025, omitted wages for June 19, 2025 and June 20, 2025. These representations cannot be reconciled. If the termination decision was made May 21, 2025, the June 17, 2025, revision contradicts the Bank's prior documentation. If the decision was made June 16, 2025, Defendants transmitted termination documentation nearly four weeks earlier without authority. Under either version, the Bank's records demonstrate that Plaintiff's termination was not the product of a consistent or legitimate employment decision

22.     **ECONOMIC DAMAGES:** As a consequence of Defendants' conduct, Plaintiff has suffered and will continue to suffer harm, including loss of past and future income and employment-related compensation, damage to her career and professional reputation, loss of wages through the stated termination date, and statutory penalties arising from Defendants' failure to pay all wages due upon discharge. THE BANK's own records represent that Plaintiff's employment continued through June 20, 2025, yet the final paycheck issued on June 23, 2025, omitted wages for June 19 and June 20, 2025.

23.     **NON-ECNOMIC DAMAGES:** As a consequence of Defendants' conduct, Plaintiff has suffered and will continue to suffer severe psychological and emotional distress, humiliation, anxiety, depression, and mental and physical pain and anguish.

   a. Plaintiff disclosed her gender identity to her employer in an act of trust and vulnerability after nearly two decades of dedicated service. In the weeks and months that followed, that trust was repaid with professional isolation, baseless accusations, deliberate exclusion, hostile and profane treatment, and ultimately termination—transmitted by opaque electronic link, addressed to her deadname. Plaintiff was given no warning, no explanation, and no opportunity to respond. She was asked only to return her laptop.

   b. The harm did not end with termination. In the months that followed, THE BANK continued to generate official records identifying Plaintiff by her former male name and incorrect honorifics— even after September 11, 2025 when a California court had entered an order legally changing her name and gender, and even after THE BANK had acknowledged that order and demonstrated its ability to use Plaintiff's correct legal name. Each document arriving in Plaintiff's mailbox bearing the name she had shed was a fresh act of erasure—a reminder that the institution that terminated

- 12 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

her still refused to acknowledge who she is. This ongoing conduct has caused Plaintiff sustained emotional suffering, loss of dignity, humiliation, and interference with her ability to move forward with her life and her medical recovery.

Plaintiff has suffered and will continue to suffer non-economic damages in sums to be proven at trial.

24.    **PUNITIVE DAMAGES**: Defendants' conduct constitutes oppression and malice under California Civil Code section 3294 and, thus, entitles plaintiff to an award of exemplary and/or punitive damages.

    a.  Defendants acted with malice in that their conduct was despicable and carried out with willful and conscious disregard of Plaintiff's rights, health, and safety. Within days of Plaintiff's disclosure of her transgender status, Defendants began systematically dismantling the professional standing she had built over nearly twenty years — revoking approved assignments, fabricating performance deficiencies, excluding her from opportunities extended to other team members, and subjecting her to hostile and profane treatment. When Plaintiff subsequently disclosed a serious medical condition under the California Family Rights Act, Defendants did not pause — they accelerated. They transmitted termination documentation within hours, addressed to her deadname. They then voided and reissued those documents in the middle of the night with shifting and irreconcilable decision dates, failed to pay all wages due through the stated termination period, and refused to engage with Plaintiff's contemporaneous written objections and reservation of rights.

    b.  Defendants further acted with malice and oppression in their treatment of Plaintiff's identity following termination. On September 11, 2025, a California court issued an order legally changing Plaintiff's name and gender. THE BANK acknowledged receipt of the certified court order. In a letter received September 17, 2025, THE BANK addressed Plaintiff by her legal name for the first time. Having demonstrated its knowledge and ability to use Plaintiff's correct legal name, THE BANK thereafter reverted to generating and transmitting official employment-related records and correspondence identifying Plaintiff by her former male name and incorrect honorifics—in documents received on or about September 18, 2025; September 22, 2025; September 26, 2025; October 3, 2025; November 15, 2025; December 15, 2025; and January 25, 2026. This conduct was not inadvertent. THE BANK had already used Plaintiff's correct name. It chose to stop. Each

- 13 -

subsequent document identifying Plaintiff by her former male name, after acknowledged receipt of a court order establishing her legal identity, constituted a deliberate act of disrespect directed at Plaintiff's gender identity and a conscious refusal to recognize her legal name.

c. Defendants additionally acted with oppression in that their cumulative conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of her rights, including the right to be free from discrimination based on gender identity, and the right to be identified in official records by her legal name following judicial decree. The hardship imposed was not incidental to a business decision. It was sustained, deliberate, and directed at the core of Plaintiff's identity as a transgender woman.

Plaintiff is entitled to an award of exemplary and punitive damages in an amount sufficient to punish Defendants and to deter similar conduct, according to proof at trial.

25.    **ATTORNEY FEES**: Plaintiff has incurred legal expenses and attorney's fees.

26.    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**: Prior to filing this action, plaintiff exhausted her administrative remedies by filing a timely administrative complaint with California's Civil Rights Department and obtained a right-to-sue letter. (Ex. A)

V

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Discrimination on the Bases of Sex, Gender Identity, Gender Expression, and Transgender Status**

(Violation of Gov. Code § 12940(a))

**Against Entity Defendants; and Does 1 to 50, Inclusive**

27.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

28.    At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants. This statute requires defendants to refrain from discriminating against any employee because but not limited to the employee's sex, gender, gender identity and/or gender expression

- 14 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**29.** Plaintiff's sex, gender, gender identity and/or gender expression, and/or other characteristics protected by FEHA, Government Code section 12900, *et seq.,* were substantial motivating reasons in Defendants' decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse employment actions against plaintiff.

**30.** As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and compensations.

**31.** As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

**32.** Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reasonable attorneys' fees and costs, including expert costs, in an amount according to proof.

**33.** Defendants' discrimination was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Plaintiff to punitive damages against Defendants.

**SECOND CAUSE OF ACTION**

**Hostile Work Environment Harassment on the Bases of Sex, Gender Identity, Gender Expression, and Transgender Status**

(Violation of Gov. Code § 12940(j))

Against All Defendants

**34.** Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

**35.** At all relevant times, Government Code section 12940, subdivision (j), was in full force and effect and binding on Defendants. This statute prohibits harassment of an employee because of sex, gender, gender identity, gender expression, and transgender status. Under Government Code section 12940, subdivision (j)(3), an employee of an entity subject to FEHA is personally liable for harassment regardless of whether the employer knew or should have known of the conduct and failed to take appropriate corrective action.

- 15 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

36.     At all relevant times, Defendants SHANKS and MAXIM were "persons" within the meaning of Government Code section 12940, subdivision (j), and "supervisors" within the meaning of Government Code section 12926, subdivision (t). Under Government Code section 12940, subdivision (j)(3), individual supervisors are personally liable for harassment regardless of whether the employer knew or should have known of the conduct and failed to take appropriate corrective action. SHANKS and MAXIM are therefore independently and personally liable for their harassing conduct. Their joinder is compelled by FEHA's express imposition of individual liability on supervisory employees who engage in harassment.

37.     Pursuant to Government Code section 12923(b), a single incident of harassing conduct can be sufficient to create a triable issue regarding the existence of a hostile work environment if the conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment.

38.     Plaintiff is a transgender woman and was, at all relevant times, a member of protected classes under FEHA.

39.     Following Plaintiff's February 26, 2025 disclosure of her transgender status, Defendants SHANKS and MAXIM subjected Plaintiff to a sustained course of unwelcome conduct directed at her because of her gender identity. The conduct was not routine personnel management. It was individually directed, personally carried out, and escalating in severity.

40.     SHANKS's harassing conduct included: escalating Plaintiff's transgender disclosure to an outside HR representative within hours of receiving it; revoking an assignment she had approved in writing and publicly praised seven days earlier, citing a justification contradicted by contemporaneous evidence; denying a routine equipment request for the first time in Plaintiff's career; transmitting a false certification report to MAXIM despite having acknowledged Plaintiff's completion five days earlier; pressuring Plaintiff to attend meetings on her day off, HR representative introduced on the day of the transgender disclosure; and co-transmitting the termination email addressed to Plaintiff's former male name.

41.     MAXIM's harassing conduct included: falsely accusing Plaintiff of not working and then admitting he had no basis for the accusation; ignoring Plaintiff's expressed interest in new assignments while distributing them to other team members; singling Plaintiff out to remain online after hours during a system outage while releasing every other employee; responding to Plaintiff's compliance with profanity

- 16 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

and dismissal; and participating in the transmission of termination documentation while the bank had already approved to be off that day.

42.    Following termination, THE BANK continued to subject Plaintiff to harassing conduct by generating and transmitting official employment records identifying her by her former male name and incorrect honorifics — even after a California court issued an order legally changing her name and gender, and even after THE BANK acknowledged that order and demonstrated its ability to use Plaintiff's correct legal name. This post-termination conduct occurred on at least seven documented occasions: September 18, 2025; September 22, 2025; September 26, 2025; October 3, 2025; November 15, 2025; December 15, 2025; and January 25, 2026.

43.    The harassing conduct described above was unwelcome, was directed at Plaintiff because of her transgender status and gender identity, and was sufficiently severe and pervasive — both individually and cumulatively — to alter the conditions of Plaintiff's employment and create an intimidating, hostile, and offensive working environment within the meaning of Government Code section 12923. Pursuant to Government Code section 12923, subdivision (b), a single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if it has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment. Plaintiff was subjected to far more than a single incident.

44.    The harassing conduct by SHANKS and MAXIM was outside the scope of any necessary personnel management action. The revocation of approved assignments without business justification, the fabrication of performance deficiencies, the profane and dismissive treatment, the singling out during team-wide events, and the persistent deadnaming after judicial decree were not actions required by any legitimate supervisory function. They were personal acts of hostility directed at Plaintiff because she is a transgender woman.

45.    As a direct and proximate result of Defendants' harassment, Plaintiff has suffered severe emotional distress, humiliation, and mental and physical pain and anguish, all to her damage in a sum according to proof.

///

///

- 17 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**46.** Defendants' harassment was committed intentionally, in a malicious, despicable, and oppressive manner, with willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to punitive damages under Civil Code section 3294.

**47.** Pursuant to Government Code section 12965, subdivision (c)(6), Plaintiff is entitled to recover reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

**Retaliation for Engaging in Protected Activity**

(Violation of Gov. Code § 12940(h))

**Against Entity Defendants; and Does 1 to 50, Inclusive**

**48.** Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

**49.** At all relevant times, Government Code section 12940, subdivision (h), was in full force and effect and binding on Defendants. This statute prohibits an employer from discharging, demoting, or otherwise discriminating or retaliating against any employee because the employee has opposed practices forbidden by FEHA, filed a complaint under FEHA, testified or assisted in any proceeding under FEHA, or otherwise engaged in activity protected by FEHA.

**50.** Plaintiff engaged in protected activity when she disclosed her transgender status to her supervisors on February 26, 2025. That disclosure was itself protected activity under FEHA, as it constituted the assertion of rights guaranteed to transgender employees under Government Code sections 12940 and 12926.

**51.** Prior to Plaintiff's February 26 transgender disclosure, her employment record was unblemished. She had received a favorable annual performance evaluation, written approval expanding her responsibilities, and public recognition from the supervisors who would later participate in her termination. At no point before her disclosure had Plaintiff been disciplined, counseled, criticized, or placed on any form of notice. There existed no documented basis for any adverse action against her.

**52.** Following Plaintiff's protected activity, Defendants subjected her to a series of escalating adverse employment actions in close temporal succession: revocation of approved assignments within days of disclosure; baseless accusations of non-performance by a supervisor who admitted he had no factual basis

- 18 -

for the claim; deliberate exclusion from newly announced opportunities while other team members received assignments; isolation and hostile treatment during a team-wide work event, including profane and dismissive language; and termination of employment — transmitted by email and addressed to her deadname.

53.     The temporal proximity between Plaintiff's protected activity and the commencement of adverse actions was immediate. The first adverse action — revocation of the E2E Complaints Initiative assignment — occurred within days of the February 26 disclosure. Each subsequent adverse action followed in unbroken sequence. The termination occurred less than three months after the disclosure. No intervening event, performance change, or business development accounts for the shift from public recognition to termination in eighty-four days.

54.     Defendants' proffered justification — a "group termination" based on geographic proximity — is pretextual. The criterion was never raised during Plaintiff's nearly twenty years of employment. Plaintiff maintained a secondary residence within three miles of the designated office. Defendant MAXIM, who did not engage in protected activity, worked under identical conditions less than two miles away and was retained. Defendants subsequently voided and reissued the termination documents with a different decision date, further demonstrating that the stated rationale was pretext and that the adverse action was motivated by **identity bias and discriminatory animus toward Plaintiff's transgender status and protected activity**.

55.     Plaintiff's protected activity was a substantial motivating reason for Defendants' decision to subject her to adverse employment actions and to terminate her employment.

56.     As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment-related compensation.

57.     As a further direct and proximate result of Defendants' retaliation, Plaintiff has suffered and continues to suffer humiliation, emotional distress, mental anguish, all to her damage in sums according to proof.

58.     Defendants' retaliation was committed intentionally, in a malicious, despicable, and oppressive manner, with willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to punitive damages under Civil Code section 3294.

- 19 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

59.    Pursuant to Government Code section 12965, subdivision (c)(6), Plaintiff is entitled to recover reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Failure to Accommodate a Disability in Violation of FEHA

(Violation of Gov. Code § 12940(m))

### Against Entity Defendants; and Does 1 to 50, Inclusive

60.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

61.    At all times herein mentioned, FEHA, Government Code section 12940(a), (i), (m), and (n), was in full force and effect and was binding on defendants. This statute requires defendants to provide reasonable accommodations to known disabled employees. Within the time provided by law, plaintiff filed a complaint with CRD, in full compliance with administrative requirements, and received a right-to-sue letter.

62.    Defendants used Plaintiff's disability as a basis for terminating her employment.

63.    Plaintiff is informed and believes, and on that basis alleges, that her disability and the need to accommodate her disability were substantial motivating reasons for Defendants' decision to terminate her employment.

64.    As a direct and proximate result of Defendants' willful, knowing, and intentional misconduct, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment-related compensation.

65.    As a further direct and proximate result of Defendants' misconduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

66.    Defendants' conduct was committed with malice, oppression, and a willful, conscious disregard for Plaintiff's rights and this entitles plaintiff for punitive damages.

67.    Pursuant to Government Code section 12965, subdivision (c)(6), Plaintiff is entitled to recover reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

- 20 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**Failure to Pay Final Wages and Issuance of Inaccurate Wage Statement**

(Violation of Labor Code §§ 201, 203, and 226)

**Against Entity Defendants; and Does 1 to 50, Inclusive**

**68.**     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

**69.**     At all relevant times, Labor Code section 201 was in full force and effect. This statute requires that when an employer discharges an employee, all wages earned and unpaid at the time of discharge are due and payable immediately.

**70.**     THE BANK represented in its own termination documentation that Plaintiff's employment would end effective June 20, 2025. Plaintiff was therefore entitled to all wages earned through that date.

**71.**     On or about June 23, 2025, THE BANK issued a payment that included accrued vacation wages consistent with a final paycheck. However, the wages included compensation only through June 18, 2025. No wages were paid for June 19 or June 20, 2025 — the final two days of the employment period that THE BANK itself had designated.

**72.**     THE BANK has offered no explanation for the omission. No written communication identified a basis for withholding wages through the stated termination date. No payroll correction has been issued.

**73.**     By failing to pay all wages due through the date it represented as Plaintiff's final day of employment, THE BANK violated Labor Code section 201.

**74.**     Plaintiff is informed and believes, and thereon alleges, that THE BANK's failure to pay all wages due was willful within the meaning of Labor Code section 203. THE BANK possessed actual knowledge of Plaintiff's stated termination date — it selected that date, it documented that date, and it transmitted that date to Plaintiff in formal termination correspondence. The decision to issue a final paycheck omitting the last two days of that self-designated period was not inadvertent. It was either a deliberate withholding or a product of the same administrative chaos that produced four irreconcilable termination dates — neither of which excuses the violation.

**75.**     As a result of THE BANK's willful failure to timely pay all wages due, Plaintiff is entitled to waiting time penalties under Labor Code section 203 in an amount according to proof, continuing for up to thirty days of wages from the date of discharge.

- 21 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**76.**    The wage statement issued in connection with the June 23, 2025 payment reflected a pay period extending beyond the dates for which wages were actually paid. A wage statement that does not accurately reflect the wages earned and the dates for which those wages were paid does not comply with Labor Code section 226.

**77.**    By issuing a wage statement that was inconsistent with the wages actually paid, THE BANK violated Labor Code section 226, subdivision (a).

**78.**    As a direct and proximate result of these violations, Plaintiff has suffered economic damages including unpaid wages, statutory penalties, and the inability to accurately assess her own compensation and employment status during a period of acute personal and medical crisis.

**79.**    Pursuant to Labor Code sections 203 and 226, subdivision (e), Plaintiff is entitled to recover statutory penalties, reasonable attorneys' fees, and costs

### SIXTH CAUSE OF ACTION

### Failure to Engage in Interactive Process

### (Violation of Government Code § 12940(a), (i), (m), (n))

### Against Entity Defendants; and Does 1 to 50, Inclusive

**80.**    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

**81.**    At all times herein mentioned, FEHA, Government Code section 12940(a), (i), (m), and (n), was in full force and effect and was binding on defendants. This statute requires defendants to engage in a timely, good faith interactive process to accommodate known disabled employees. Within the time provided by law, plaintiff filed a complaint with the CRD, in full compliance with administrative requirements, and received a right-to- sue letter.

**82.**    Defendants wholly failed to engage in a timely, good-faith interactive process with Plaintiff to accommodate her known disabilities. Instead, Defendants terminated Plaintiff's employment in part because of her disabilities.

**83.**    Plaintiff is informed and believes, and on that basis alleges, that her disability was a substantial motivating factor in Defendants' decision to terminate her employment.

- 22 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

84. As a proximate result of Defendants' willful, knowing, and intentional misconduct, Plaintiff has sustained and continues to sustain substantial losses of earnings.

85. As a proximate result of Defendants' willful, knowing, and intentional misconduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

86. Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reasonable attorneys' fees and costs, including expert costs, in an amount according to proof.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Discrimination, Harassment, and Retaliation

(Violation of Gov. Code § 12940(i))

Against SHANKS and MAXIM

87. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

88. At all relevant times, Government Code section 12940, subdivision (i), was in full force and effect. This statute makes it unlawful for any person to aid, abet, incite, compel, or coerce the doing of any act forbidden by FEHA.

89. DEFENDANT SHANKS knowingly and substantially assisted THE BANK's discriminatory and retaliatory conduct. Within hours of receiving Plaintiff's February 26, 2025 transgender disclosure, SHANKS escalated it to Loren Reed — an individual with whom Plaintiff had no prior interaction and who later co-transmitted the termination notice. In the weeks that followed, SHANKS revoked Plaintiff's approved participation in the E2E Complaints Initiative citing a justification contradicted by contemporaneous evidence, denied a routine equipment request for the first time in Plaintiff's career, and transmitted a false certification report to MAXIM despite having acknowledged Plaintiff's completion five days earlier. On May 21, 2025, SHANKS pressured Plaintiff to return to work, then co-transmitted the termination email addressed to Plaintiff's former male name while Plaintiff was not working. SHANKS thereafter responded to Plaintiff's written dispute of the termination solely by directing her to return company equipment.

- 23 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

90.    DEFENDANT MAXIM knowingly and substantially assisted THE BANK's discriminatory and retaliatory conduct. After Plaintiff's transgender disclosure, MAXIM falsely accused Plaintiff of not working and then admitted he had no basis for the claim. MAXIM ignored Plaintiff's expressed interest in newly announced assignments while distributing them to other team members. MAXIM singled Plaintiff out to remain online after hours during a system outage while releasing every other employee, then responded to Plaintiff's compliance with profanity and dismissal. MAXIM worked remotely under the same geographic and operational conditions cited as the basis for Plaintiff's separation, yet was retained, reassigned, and now reports to Loren Reed.

91.    The conduct of SHANKS and MAXIM was not routine personnel management. It was active, knowing, and substantial participation in a course of discriminatory and retaliatory conduct that began with Plaintiff's transgender disclosure and culminated in her termination. Each acted with awareness of Plaintiff's protected status, awareness of THE BANK's obligations under FEHA, and awareness that the actions they were taking were directed at Plaintiff because of her gender identity and were motivated by **identity bias and discriminatory animus toward transgender employees**.

92.    As a direct and proximate result of the conduct of SHANKS and MAXIM, Plaintiff has suffered the damages set forth above, including loss of employment, loss of earnings, emotional distress, humiliation, deterioration of her medical condition, and other harm according to proof.

93.    The conduct of SHANKS and MAXIM was committed intentionally, in a malicious, despicable, and oppressive manner, with willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to punitive damages against each of them individually under Civil Code section 3294.

94.    Pursuant to Government Code section 12965, subdivision (c)(6), Plaintiff is entitled to recover reasonable attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**

**Failure to Prevent Discrimination, Harassment, or Retaliation**

**(Violation of Government Code § 12900(k), et seq.)**

**Against Entity Defendants; and Does 1 to 100, Inclusive**

95.    Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

- 24 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

96.     At all times herein mentioned, Government Code section 12940, subdivision (k), was in full force and effect and binding on Defendants. This statute makes it an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring.

97.     Defendants knew or should have known that Plaintiff was being subjected to discrimination, harassment, and retaliation based on her sex, gender, gender identity, gender expression, and protected activity, yet failed to take reasonable steps to prevent such conduct.

98.     Defendants failed to implement reasonable policies, training, supervision, and corrective action necessary to prevent discrimination, harassment, and retaliation against Plaintiff.

99.     As a direct and proximate result of Defendants' failure to prevent discrimination, harassment, and retaliation, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment-related compensation.

100.    As a further direct and proximate result of Defendants' misconduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

101.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reasonable attorneys' fees and costs, including expert costs, in an amount according to proof.

102.    Defendants' conduct was committed intentionally, in a malicious, despicable, and oppressive manner, entitling Plaintiff to punitive damages under Civil Code section 3294.

## NINTH CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

(*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167)

### Against Entity Defendants; and Does 1 to 50, Inclusive

103.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

104.    Defendants terminated Plaintiff's employment in violation of fundamental public policies embodied in California law, including but not limited to the California Fair Employment and Housing Act

- 25 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

(Gov. Code §12900 et seq.), which prohibits discrimination, harassment, and retaliation based on protected characteristics including sex, gender identity, gender expression, and transgender status, and California Labor Code section 1102.5, which protects employees from retaliation for engaging in protected activity.

105.    Plaintiff engaged in conduct protected by these public policies, including disclosing her gender identity, asserting her rights under FEHA, and opposing unlawful discrimination and retaliation.

106.    Defendants terminated Plaintiff's employment because of her protected status and protected activity, in violation of these fundamental public policies.

107.    As a direct and proximate result of Defendants' wrongful termination, Plaintiff has suffered and continues to suffer loss of earnings, emotional distress, humiliation, and mental and physical pain and anguish, all in amounts according to proof.

108.    Defendants' conduct was intentional, malicious, despicable, and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to punitive damages under Civil Code section 3294.

109.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Code of Civil Procedure sections 1021.5 and 1032, Plaintiff is entitled to recover reasonable attorneys' fees and costs according to proof.

///

///

///

///

///

///

///

///

///

///

///

///

- 26 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

# VI

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF LUNA D'SOL prays for judgment against DEFENDANTS, and each of them, as follows:

a) Compensatory Damages: For compensatory damages according to proof for the harm caused by Defendants' unlawful conduct;

b) Economic Damages: For all economic damages, including but not limited to back pay, front pay, and the value of all lost employment-related compensation, according to proof;

c) Non-Economic Damages: For emotional distress and mental anguish damages;

d) Punitive Damages: For punitive damages under Civil Code section 3294 against all Defendants who acted with malice, oppression, or reckless disregard;

e) Equitable Relief: For restitution of all sums unlawfully withheld or acquired by Defendants;

f) Declaratory Relief: For a declaration that Defendants' conduct violated FEHA, CFRA, and the public policy of the State of California;

g) Injunctive Relief: For a permanent injunction ordering the correction of Plaintiff's employment records and data to accurately reflect the circumstances of their employment;

h) Reinstatement: For reinstatement to their former position or, in the alternative, an award of front pay;

i) Attorney's Fees: For reasonable attorney's fees and costs of suit pursuant to Government Code section 12965;

j) Interest: For prejudgment and post-judgment interest as permitted by law;

k) General Relief: For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

///

///

///

- 27 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**VERIFICATION**

I, LUNA D'SOL, am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 3rd, 2026, at Palm Springs, CA

/s/ Luna D'Sol
_____

LUNA D'SOL, Plaintiff In Pro Per

- 28 -

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

# EXHIBIT A
# CRD - RIGHT TO SUE



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 11, 2025

Luna D'Sol
2275 E Belding Dr
Palm Springs, CA 92262

RE:   **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202508-30704712
Right to Sue: D'Sol / Bank of America et al.

Dear Luna D'Sol:

This letter informs you that the above-referenced complaint filed with the Civil Rights
Department (CRD) has been closed effective August 11, 2025 because an immediate
Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation
Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave
(Government Code sections 12945.2, 12945.6, or 12945.7) has the right to
participate in CRD's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in CRD's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation. The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. Contact
CRD's Small Employer Family Leave Mediation Pilot Program by emailing
DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number
indicated on the Right to Sue notice.



STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

## Civil Rights Department

KEVIN KISH, DIRECTOR

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)