# EXHIBIT 1

**Luna D'Sol**

Plaintiff, In Pro Per

Email Address: jravada@icloud.com

2275 E Belding Dr

Palm Springs CA 92262

Telephone: 213-925-4069

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/14/2026 1:20 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

LUNA D'SOL

                    Plaintiff,

           vs.

JAE H. KIM, ESQ.;
JHK LAW, APC; and
DOES 1 THROUGH 25, inclusive,

                Defendants.

)
)
) Case No: 26STCV01294
)
)
)   **COMPLAINT FOR:**
)
)
) 1. Breach of Fiduciary Duty
) 2. Professional Negligence (Legal Malpractice)
) 3. Cancellation of Instruments (Civ. Code § 3412)
) 4.  Declaratory Relief
) 5. Constructive Fraud
) 6. Undue Influence
) [Quiet Title Relief Requested **(CCP § 760.020 et seq.)]**
) [Equitable Relief Sought]
) [Verified Complaint]

### I
### PARTIES

**1.**    **PLAINTIFF Luna D'Sol** (formerly known as Julio Ravada) is an individual residing in Palm Springs, California. At all relevant times, PLAINTIFF owned and managed multiple residential real properties in California, including a primary residence located in Palm Springs and additional properties located in Los Angeles County, which are the subject of the transactions and conduct alleged herein.

**2.**    At all relevant times, PLAINTIFF was employed by Bank of America and was a participant in the employer-sponsored **MetLife Prepaid Legal Plan – Full Coverage**, through which eligible employees are provided access to participating network attorneys for defined legal matters, including civil litigation defense and related legal services.

3.    **DEFENDANT Jae H. Kim** is, and at all relevant times was, an attorney licensed to practice law in the State of California (State Bar No. 212610). DEFENDANT is the principal and controlling attorney of **JHK Law, APC**, a California professional corporation with offices located in Pasadena, California. DEFENDANT transacted business, provided legal services, and engaged in the acts and omissions alleged herein within the State of California.

4.    At all relevant times, DEFENDANT held himself out as a participating network attorney under the MetLife Prepaid Legal Plan and accepted legal matters referred through that program, including PLAINTIFF's litigation matter and related legal issues. DEFENDANT's relationship with PLAINTIFF arose from and was grounded in this attorney–client engagement.

5.    **DEFENDANT JHK Law, APC** is, and at all relevant times was, a California professional corporation authorized to provide legal services in California, with its principal place of business in Pasadena, California. JHK Law, APC acted through DEFENDANT Jae H. Kim and is vicariously liable for his acts and omissions alleged herein, which were undertaken within the course and scope of his authority and employment.

6.    **DOE DEFENDANTS 1 through 25,** inclusive, are individuals and/or entities whose true names and capacities are presently unknown to PLAINTIFF. PLAINTIFF is informed and believes, and thereon alleges, that each DOE DEFENDANT participated in, directed, aided and abetted, benefited from, or ratified the wrongful conduct alleged herein, including but not limited to the preparation, transmission, execution, recording, enforcement, or attempted enforcement of the transaction instruments and related acts. PLAINTIFF will seek leave of Court to amend this Complaint to substitute the true names and capacities of the DOE DEFENDANTS when they are ascertained.

## II
## JURISDICTION AND VENUE

7.    This Court has **subject matter jurisdiction** over this action pursuant to **Article VI, section 10 of the California Constitution**, which vests the superior courts with original jurisdiction in all civil causes except those given by statute to other courts. This action asserts claims for professional negligence, breach of fiduciary duty, rescission and cancellation of instruments, quiet title, and related equitable and legal relief, all of which fall within the original jurisdiction of this Court.

8.    This Court has **personal jurisdiction** over DEFENDANT Jae H. Kim and DEFENDANT JHK Law, APC because, at all relevant times, DEFENDANT was licensed to practice law in California, maintained a law practice in California, held himself out as a California attorney, and performed the acts and omissions alleged herein within the State of California. Those acts include, but are not limited to, accepting representation of PLAINTIFF through a California-based legal services plan, providing legal advice to a California resident, drafting and transmitting legal and transactional documents affecting California real property, directing recording activity in California counties, and communicating with California courts, lenders, escrow participants, and opposing counsel. Each claim asserted in this action arises directly out of DEFENDANT's California-based conduct.

**9.** Venue is proper in this Court pursuant to **Code of Civil Procedure sections 392 and 395** because this action concerns title to, interests in, and encumbrances upon real property located in this County, and because a substantial portion of the acts and omissions giving rise to the claims occurred in this County. These include the preparation, transmission, execution, and recording of deeds, deeds of trust, and related instruments affecting property located here, as well as DEFENDANT's provision of legal services and direction of actions intended to be carried out in this County.

**10.** Venue is further proper because DEFENDANT's wrongful conduct was purposefully directed at property, transactions, and legal proceedings situated in this County, and because the injuries suffered by PLAINTIFF—including clouded title, foreclosure-related harm, and loss of property rights—were sustained in this County.

**11.** No enforceable **forum selection clause** governs the claims asserted in this action. The purported retainer agreements and conflict waiver documents relied upon by DEFENDANT do not contain any mandatory forum selection provision applicable to these claims, and no agreement between the parties requires that this action be brought in any forum other than this Court.

**12.** Accordingly, the exercise of jurisdiction and venue by this Court is proper, fair, and consistent with due process, as DEFENDANT could reasonably anticipate being haled into a California court based on his purposeful availment of the benefits and protections of California law and his conduct giving rise to the claims alleged herein.

**III**
**GENERAL FACTUAL ALLEGATIONS**

**A. PLAINTIFF'S LEGAL AND FINANCIAL CIRCUMSTANCES**

**13.** In or about April 2025, PLAINTIFF was a defendant in a pending civil lawsuit filed by a former acquaintance, **Melissa Gomez v. Julio Ravada** (the "Gomez Action"). (*Ex. 1 — Gomez Action Summons and Complaint.*)

**14.** At the time PLAINTIFF contacted DEFENDANT, PLAINTIFF was experiencing significant financial strain and time pressure, including mounting consumer debt and an impending nonjudicial foreclosure affecting her primary residence. The foreclosure could be stopped only by making a reinstatement payment of **$143,631.24** by **May 20, 2025**, prior to a scheduled sale date of **May 21, 2025**. (*Ex. 2 — Reinstatement Quote.*)

**15.** At all relevant times, PLAINTIFF owned and held title to multiple residential real properties in California, including:

    a. A primary residence located at **2275 East Belding Drive, Palm Springs, California 92262**, County of Riverside, identified by **Assessor's Parcel Number 502-042-005** (the "Palm Springs Property");

    b. A residential condominium located at **6540 Hayvenhurst Avenue, Unit 22, Van Nuys, California 91406**, County of Los Angeles, identified by **Assessor's Parcel Number 2231-004-040** (the "Reseda Property");

– 3 –

COMPLAINT

   c.  A single-family residential property located at **13236 Klein Court, Sylmar, California 91342**, County of Los Angeles, identified by **Assessor's Parcel Number 2513-027-069** (the "Sylmar Property"); and

   d.  Reseda Property.

Collectively, these properties are referred to herein as the **"Subject Properties."**

**16.** At the relevant time, the Sylmar and Reseda properties were actively listed on the Multiple Listing Service and were each subject to accepted purchase offers and pending escrows. The buyers in both transactions failed to timely perform material contractual obligations, placing both escrows in jeopardy. (*Ex 3 – Sylmar and Reseda Notice to Buyer to Perform*)

### B.     FORMATION OF ATTORNEY–CLIENT RELATIONSHIP AND FIDUCIARY

**17.** On or about April 29, 2025, DEFENDANT accepted PLAINTIFF's request for legal assistance through Bank of America's MetLife Prepaid Legal Plan after receiving PLAINTIFF's MetLife member identification number. DEFENDANT thereafter communicated with PLAINTIFF regarding the pending civil action *Melissa Gomez v. Julio Ravada* (the "Gomez Action"), requested and received the summons, complaint, and related pleadings, and engaged in communications consistent with providing legal representation and advice in connection with that litigation.

**18.** DEFENDANT did not disclaim representation, limit the scope of his role, or advise PLAINTIFF that he was not acting as her attorney. To the contrary, DEFENDANT's conduct—including requesting litigation pleadings, confirming receipt, discussing case-related matters, and continuing communications regarding the Gomez Action—would cause a reasonable person in PLAINTIFF's position to believe that DEFENDANT had undertaken representation as counsel of record in that matter.

**19.** PLAINTIFF reasonably relied on DEFENDANT's conduct, communications, and professional judgment **because DEFENDANT was acting as her attorney through the MetLife Prepaid Legal Plan** and held himself out as providing legal counsel in a time-sensitive litigation matter. PLAINTIFF relied on DEFENDANT's legal expertise, fiduciary obligations, and duty of loyalty when providing pleadings, following his guidance, and refraining from retaining separate counsel for the Gomez Action during this critical period. This reliance arose from DEFENDANT's role as an attorney—not as a business counterparty—and established the fiduciary duty that governed all subsequent interactions.

### C. IMPROPER DUAL REPRESENTATION AND FAILURE TO PROVIDE REQUIRED DISCLOSURES

**20.** Having accepted representation of PLAINTIFF for the discrete and straightforward purpose of defending the Gomez Action, DEFENDANT did not confine his communications to litigation strategy, procedural obligations, or legal defense. Instead, **almost immediately after establishing the attorney–client relationship**, DEFENDANT redirected discussions away from the Gomez Action and toward PLAINTIFF's real estate holdings, equity positions, and potential financial or transactional arrangements unrelated to the litigation.

COMPLAINT

**21.** When PLAINTIFF asked how such an "investor" could be identified, DEFENDANT responded that he "might know somebody," thereby inserting himself into a prospective business role while the Gomez Action remained pending and unresolved. This transition—from trusted litigation counsel to intermediary in potential self-interested transactions—occurred without any written disclosure, limitation of role, or advisement that DEFENDANT's interests might diverge from PLAINTIFF's.

**22.** On or about May 7, 2025, DEFENDANT instructed PLAINTIFF to transmit **$400 via Zelle** as a condition of his willingness to travel to PLAINTIFF's residence and conduct an in-person walkthrough or inspection of the property. This request was made outside any written engagement agreement, invoice, or documented authorization under the MetLife Prepaid Legal Plan. (*Ex. 4, Page 4 — Text Messages: Zelle Request.*)

**23.** On May 11, 2025, after confirming receipt of the Gomez Action pleadings, DEFENDANT did not provide substantive legal advice regarding defenses, procedural posture, or next steps in the Gomez Action. Instead, DEFENDANT indicated that future discussions would concern PLAINTIFF's properties, stating that PLAINTIFF could "let me know if you want to discuss further about your properties next week." (*Ex. 4 Page 7 - Text Messages: May 11th Shit to Properties*)

**24.** In the Sylmar and Reseda escrows, the buyers failed to timely perform material contractual obligations. DEFENDANT provided written advice regarding notices and deadlines, including: "If the buyers do not close by May 20, make sure you have unilateral right to cancel escrow and get the initial deposit by May 25 or earlier. If you need a quick injection of funds, we can make another arrangement," and "Let's see how they respond. You should give them a deadline of today 5 pm." (*Exs. 5–6, Emails from Jae Kim.*)

    D.    **PURPORTED CONFLICT WAIVER AND RETAINER; NO DISCLOSURE OF GOMEZ MATTER**

**25.** On or about May 15, 2025, while DEFENDANT was still communicating with PLAINTIFF as her attorney, DEFENDANT requested that PLAINTIFF provide extensive personal, financial, and property-related documentation in connection with a proposed transaction involving PLAINTIFF's real property. PLAINTIFF provided the requested materials at DEFENDANT's direction.

**26.** At the time DEFENDANT solicited and received this information, DEFENDANT had not provided PLAINTIFF with a written disclosure describing the structure, valuation, consideration, or legal characterization of the proposed transaction.

**27.** On or about May 16, 2025, DEFENDANT expressly acknowledged to PLAINTIFF that the proposed transaction and conflicted arrangement could "get him in trouble." Despite this express recognition of the impropriety and risk of his conduct, DEFENDANT nevertheless proceeded to seek execution of the waiver, continued preparing and transmitting transaction documents adverse to PLAINTIFF, and did not suspend the conflicted conduct or advise PLAINTIFF to obtain independent legal counsel. (*Exs 7,8 – Purported Conflict Waiver and Purported Reseda/ Sylmar Retention Agreement*).

COMPLAINT

**28.**     The Purported Conflict Waiver did not set forth the specific economic terms of the property transaction later implemented (including purchase price, valuation methodology, allocation of equity, lien priority, repayment structure, management authority, or reconveyance/exit conditions), and did not attach or incorporate the operative grant deeds, deeds of trust, promissory notes, assignments, or recorder documents later transmitted.

**29.**     The Conflict Waiver did not identify or disclose DEFENDANT's preexisting attorney–client relationship with PLAINTIFF arising from the Gomez Action and did not state that DEFENDANT had been engaged through MetLife specifically for the Gomez Action.

**30.**     The Retainer Agreement likewise did not reference the Gomez Action and did not describe representation relating to that lawsuit, foreclosure defense, or any attorney–client business transaction involving transfer of ownership interests, liens, or other adverse pecuniary interests in PLAINTIFF's properties.

**E. DEFENDANT'S PROPOSED TRANSACTION TERMS AND ESCALATING SELF-DEALING**

**31.**     On May 16, 2025, **DEFENDANT Jae H. Kim**, while acting as PLAINTIFF's attorney, **sent PLAINTIFF a written proposal** outlining a transaction involving transfers of ownership interests and liens against PLAINTIFF's real properties. DEFENDANT stated that he would **personally prepare and control all documents** to be executed and recorded, including grant deeds, deeds of trust, promissory notes, and related instruments. (*Ex. 9 – Email from Defendant Outlining Terms Dated May 16th, 2025.*)

**32.**     In that proposal, DEFENDANT stated that he would prepare a grant deed conveying a **95% ownership interest** in the Lake Balboa property to himself (or an entity designated by him), leaving PLAINTIFF with only a **5% undivided interest**. DEFENDANT further proposed that he would receive **100% of rental income**, assume **exclusive management authority**, and control the payment of all bills and expenses associated with the property. (Id.)

**33.**     In the same written communication, DEFENDANT referenced an outstanding electrical bill of approximately **$7,000** for the Lake Balboa property and represented that, under his proposed arrangement, **he would manage and pay such obligations**, while retaining exclusive control over income and operations. (*Id.*)

**34.**     With respect to PLAINTIFF's primary residence in Palm Springs, DEFENDANT proposed a **separate transaction structure** involving the recordation of a **$40,000 deed of trust in his favor**, accompanied by a **zero-interest promissory note** with repayment deferred until June 2026. DEFENDANT represented that he would prepare and control all related documents. (*Id.*)

///

///

///

///

**35.**     On May 17th, 2025, while DEFENDANT was proposing these self-interested transaction terms, he **continued to act as PLAINTIFF's litigation counsel** in an unrelated matter. During this period, DEFENDANT issued a written demand regarding the Sylmar escrow in which he expressly represented that his law office "**represents the Seller**," asserted PLAINTIFF's contractual entitlement to a **$20,100 security deposit**, and threatened litigation if mediation did not proceed. DEFENDANT did not disclose that his proposed financial interests in PLAINTIFF's properties were adverse to her interests as a litigant or property owner. (*Ex. 10 – Defendant Issued Demand to Buyers of Sylmar Property Dated May 17, 2025*)

**F.    MAY 18–19 DOCUMENT TRANSMISSIONS; STAGGERED DISCLOSURE, CHANGING TERMS, AND EXPANDED INSTRUMENTS**

**36.**     On or about **May 18, 2025**, approximately **two days before the scheduled foreclosure sale** of PLAINTIFF's primary residence, **DEFENDANT telephoned PLAINTIFF** and stated that he would no longer proceed with a transaction involving a single property and instead **required interests in two properties** as a condition of providing financial assistance. DEFENDANT made this demand while knowing that PLAINTIFF faced an imminent foreclosure deadline and lacked practical alternatives.

**37.**     Later that same day, on **May 18, 2025, at approximately 10:14 p.m.**, DEFENDANT **emailed PLAINTIFF two short-form, one-page grant deeds** purporting to affect the Lake Balboa and Sylmar properties. Each deed expressly stated on its face: **"See attached Exhibit A — Legal Description."** DEFENDANT did **not attach or provide Exhibit A**, did not explain the omission, and did not advise PLAINTIFF of the legal significance of executing deeds that expressly incorporated **undisclosed attachments**. *(Ex. 11,12 – Purported Unrecorded Draft Deed Prepared by Defendant for Sylmar and Lake Balboa).*

**38.**     On **May 19, 2025, at approximately 4:22 p.m.**, DEFENDANT transmitted a subsequent email attaching a PDF titled **"Ravada. Deeds and Preliminary.pdf."** This transmission included the **same two purported unrecorded grant deeds** previously sent, now accompanied by the previously omitted **Exhibit A legal descriptions**, as well as **Preliminary Change of Ownership Reports ("PCORs")** associated with each transfer. (*See id, Ex 13 – Exhibit A and Preliminary PCORs*).

**39.**     In the **May 19, 2025 (4:22 p.m.)** email, DEFENDANT **directed PLAINTIFF to immediately review, print, notarize, and personally record** the documents at the Los Angeles County Recorder's Office the **following morning**, provided step-by-step instructions regarding notarization and recording procedures, and **instructed PLAINTIFF to date the documents May 19, 2025, and proceed without delay**. (*See Id.*).

**40.**     The PCORs transmitted at 4:22 p.m. **characterized each transfer as a "purchase" transaction**, listed a stated purchase price of approximately **$70,000** for the Lake Balboa property and **$75,000** for the Sylmar property, identified **DEFENDANT (and/or a trust designated by him)** as transferee/buyer and PLAINTIFF as transferor/seller, and were **executed and signed by DEFENDANT alone**. (*See Id.*).

///

– 7 –

COMPLAINT

41.    The May 19, 2025 (4:22 p.m.) document package **did not include any integrated written agreement** describing the complete economic terms, risk allocation, lien structure, management rights, reconveyance or exit conditions, or the relationship between the two transfers. Nor did it explain how the stated "purchase" amounts related to the **$143,631.24 reinstatement payment** required to stop the foreclosure.

42.    Later that same evening, on **May 19, 2025, at approximately 9:31 p.m.**, DEFENDANT **transmitted a second email** attaching multiple transactional documents. Several documents **bore the same titles** as those transmitted earlier that day but contained **materially different and expanded terms** affecting ownership characterization, debt obligations, lien exposure, remedies, and control of PLAINTIFF's properties. (*Ex. 14 – Emails and Attached Altered Legal Documents Dated May 19th, 2025, 9:31 pm*).

43.    The **9:31 p.m. transmission** included **expanded multi-page deeds of trust**, corresponding promissory notes, **assignments of rents**, and a **power of attorney**, and reflected **materially increased secured amounts**, expanded remedies, and broadened control rights in favor of DEFENDANT and entities or trusts designated by him. (See Id.).

44.    Among the material changes introduced in the late-evening transmission, the PCOR values for the Sylmar and Lake Balboa properties **no longer reflected $70,000 and $75,000**, but instead listed **approximately $200,000 per property**, and the corresponding security instruments imposed **substantially broader lien rights and remedies** than those disclosed in the earlier transmissions. (*See ¶¶40, 42*).

45.    **In the same late-evening transmission, DEFENDANT for the first time included a deed of trust and corresponding promissory note encumbering PLAINTIFF's primary residence located at 2275 E. Belding Drive, Palm Springs, California, purporting to secure an obligation in the principal amount of approximately $150,000.00 in favor of DEFENDANT and/or an entity or trust designated by him.** This lien instrument had not been disclosed, transmitted, or referenced in the earlier May 19, 2025 (4:22 p.m.) document package, and its introduction materially expanded the scope of the transaction by adding a new encumbrance against PLAINTIFF's primary residence without prior notice, explanation, or opportunity for independent review. (*See ¶42*).

46.    DEFENDANT **did not provide any written comparison**, explanation, or disclosure identifying what had changed between the May 18, May 19 (4:22 p.m.), and May 19 (9:31 p.m.) document sets, and did not explain the **legal or economic consequences** of the expanded instruments. The staggered, late-night transmission of materially different documents **obscured the true scope of the transaction** and prevented informed review. (*See ¶¶ 37, 38, 42*)

///

///

///

Case 5:26-cv-03535-JGB-SP   Document 61-1   Filed 08/03/26   Page 10 of 33   Page
ID #:1618

**47.** DEFENDANT orchestrated the timing of these disclosures while imposing **extreme time pressure**. Because PLAINTIFF resided approximately **two hours** from the Los Angeles County Recorder's Office, DEFENDANT **arranged an 8:00 a.m. recording appointment** for May 20, 2025, and **paid for PLAINTIFF's overnight hotel stay**, knowing PLAINTIFF would be traveling and unable to meaningfully review or compare documents late at night. (*Ex. 15 – Defendant's Hotel Reservation for Plaintiff*)

**48.** DEFENDANT transmitted the materially expanded **9:31 p.m. document package** after arranging PLAINTIFF's travel and with knowledge that PLAINTIFF had **no practical opportunity to consult independent counsel**, negotiate terms, or decline execution before the early-morning recording appointment and the imminent foreclosure reinstatement deadline. The timing and sequencing of DEFENDANT's disclosures were **designed to secure execution without informed consent**. (*See ¶¶ 42, 47*).

### G. FUNDING ATTEMPT; WIRE CANCELLATION; FORECLOSURE

**49.** On May 20, 2025, PLAINTIFF and DEFENDANT went together to a bank branch for the purpose of wiring funds to reinstate the mortgage on PLAINTIFF's primary residence. DEFENDANT represented that he would wire approximately $143,631.24 to reinstate the loan and stop the foreclosure. (*See Ex. 16 – Wire for Reinstatement of Loan*)

**50.** DEFENDANT initiated a wire transfer for that amount, and PLAINTIFF relied on DEFENDANT's representations and conduct as confirmation that the transaction documents DEFENDANT prepared and directed her to execute and record were supported by actual funding and would accomplish the stated purpose of preventing foreclosure. (*See Id.*)

**51.** Later that same day, at approximately 4:33 p.m., DEFENDANT sent PLAINTIFF an email from his Chase account advising that the wire had been canceled, stating that the cancellation occurred because a deposited check associated with a credit card transaction had insufficient funds and the deposited funds were therefore unavailable to support the wire. (*See Ex. 17 – Wire Cancelation Notice Dated May 20, 2025*).

**52.** The reinstatement funds DEFENDANT represented would be transmitted to stop the foreclosure were not delivered as promised. DEFENDANT did not provide substitute funding, did not secure replacement financing, and did not take steps to ensure timely reinstatement before the foreclosure deadline.

**53.** On or about May 21, 2025, **PLAINTIFF's primary residence was sold at foreclosure.** (*See Ex. 18 - County Recorded Sale*).

////

////

////

///

– 9 –

COMPLAINT

### H.    JOB TERMINATION AND DEFENDANT'S AWARENESS

54.    On or about May 21, 2025, PLAINTIFF was terminated from her employment with Bank of America, resulting in loss of income and employer-sponsored benefits, including the MetLife plan. PLAINTIFF informed DEFENDANT of the termination, and DEFENDANT was aware that this development further exacerbated PLAINTIFF's financial instability and reliance on DEFENDANT in connection with her remaining legal and property matters. (*See Ex. 19 – Plaintiff Shared Employment Update*)

### I.   POST-FORECLOSURE COMMUNICATIONS; SELF-INTERESTED STEERING; "EXPERT"

55.    On May 22, 2025, DEFENDANT sent PLAINTIFF a written communication minimizing PLAINTIFF's legal rights and discouraging enforcement of contractual remedies relating to the Sylmar transaction, including statements characterizing PLAINTIFF's position as a "weak challenge" and advising against rescission or deposit recovery. (*See Ex. 20 – Defendant's Email Dated May 22nd 2025*).

56.    In the same communication, DEFENDANT framed PLAINTIFF's enforcement decisions in terms of their impact on DEFENDANT's own interests, including statements that pursuing mediation or arbitration would "tie up" the property, prevent leasing, and impair his ability to "pay for the mortgage and expenses," and referenced effects on "me and my wife and our relationship as well." (*See Id.*).

57.    On or about May 24, 2025, DEFENDANT sent PLAINTIFF an email stating he had "found an expert" and offering to arrange a consultation. PLAINTIFF later learned that DEFENDANT had communicated with that person and expressed that DEFENDANT believed PLAINTIFF was "wrong," including in a message DEFENDANT failed to remove before transmitting. (*See Ex. 21 – Expert Email*).

58.    Although recorder documents characterized the transfers as "purchases," DEFENDANT did not disclose to PLAINTIFF in advance that the transaction would be structured, recorded, or legally treated as a purchase/sale transaction, and no purchase agreement, escrow instructions, valuation analysis, or arms-length negotiation occurred. Instead, DEFENDANT prepared and transmitted recorder-facing instruments characterizing the transfers as "purchases" while simultaneously representing the arrangement to PLAINTIFF as temporary financing to stop foreclosure. (*See ¶42*).

### J.    POST-FORECLOSURE HANDLING OF THE SYLMAR PROPERTY; REVERSAL OF POSITION

59.    Following the foreclosure, DEFENDANT continued to involve himself in matters relating to PLAINTIFF's remaining properties, including the Sylmar property.

60.    At that time, the Sylmar property remained subject to an accepted purchase agreement in which the buyer had failed to timely perform material contractual obligations, and PLAINTIFF required careful, conflict-free guidance regarding cancellation rights, deposit recovery, and enforcement strategy. (*See ¶16*).

///

- 10 -

COMPLAINT

**61.** DEFENDANT's post-foreclosure communications discouraged enforcement actions that DEFENDANT had previously threatened in writing on PLAINTIFF's behalf in his mediation demand letter, including his prior assertion that PLAINTIFF was contractually entitled to recover the $20,100 security deposit and his prior threat of litigation for nonperformance. (*See* ¶¶*35, 57*)

**62.** This reversal occurred after DEFENDANT had obtained personal financial interests and control leverage affecting PLAINTIFF's properties and after DEFENDANT began framing PLAINTIFF's enforcement decisions in terms of their adverse impact on DEFENDANT's own rental, expense, and transactional interests. (*See* ¶¶ *16, 35, 48-49, 57*)

**K.      JUNE 2, 2025, RECORDING TRANSMISSION; SELECTIVE DISCLOSURE AND OMISSIONS**

**63.** On or about **June 2, 2025**, DEFENDANT transmitted to PLAINTIFF an email attaching documents that DEFENDANT described as the "recording documents" for the May 2025 transaction—i.e., documents DEFENDANT represented as reflecting the instruments recorded, or intended to be recorded, in connection with the conveyances and encumbrances DEFENDANT had prepared and directed PLAINTIFF to execute. (*See Ex. 22 – Transmitted Documents Email from June 2nd, 2025*).

**64.** The June 2, 2025, transmission did not include a complete or reconciled set of transaction documents. Instead, it consisted of a **limited subset of recorder-facing instruments**, transmitted without any index, cover memorandum, recording receipt, instrument numbers, or explanation identifying: (a) which documents had been recorded; (b) which documents had been executed but not recorded; or (c) which documents had been prepared but not used. (*See Id.*).

**65.** Comparing the June 2, 2025 transmission to the document package transmitted by DEFENDANT on **May 19, 2025, at approximately 9:31 p.m.**, PLAINTIFF is informed and believes that the June 2 transmission **omitted multiple material instruments** that had previously been included in the May 19 late-evening package and/or executed at DEFENDANT's direction, including, without limitation: (a) **Assignments of Rents**; (b) **Powers of Attorney** granting DEFENDANT and/or his designees control or agency authority; and (c) other instruments reflecting expanded remedies, control rights, or leverage in favor of DEFENDANT. (*See* ¶¶ *42, 63*).

**66.** DEFENDANT did not disclose whether the omitted instruments had been: (a) recorded separately; (b) withheld from recording; (c) rejected by the recorder; (d) superseded by later instruments; or (e) retained by DEFENDANT after execution. DEFENDANT provided no reconciliation between: (i) the May 19, 2025, 9:31 p.m. document package; (ii) the documents actually executed and notarized; and (iii) the documents transmitted on June 2, 2025, as the purported "recording documents." (*See Id.*).

**67.** By transmitting only a partial set of documents on June 2, 2025, without identifying omitted instruments or explaining their status, DEFENDANT left PLAINTIFF without the ability to determine which documents DEFENDANT contended were operative, which rights or obligations DEFENDANT asserted under the transaction, and which instruments, if any, affected title, possession, rental income, or control of PLAINTIFF's properties. (*See Id.*).

**68.** At no time prior to or contemporaneous with the June 2, 2025, transmission did DEFENDANT provide PLAINTIFF with a complete, final, and consolidated statement of the transaction's operative terms or the full set of instruments DEFENDANT claimed governed the parties' rights and obligations. DEFENDANT's selective disclosure occurred after execution and recording-related steps had already taken place and after DEFENDANT had assumed control positions affecting PLAINTIFF's properties. (*See ¶ 63*).

**L.    CONTINUED NEGLECT OF LITIGATION DUTIES; SUBSTITUTION FAILURE; EVICTION NOTICE**

**69.** After the foreclosure of PLAINTIFF's primary residence and while DEFENDANT continued to hold recorded interests and leverage affecting PLAINTIFF's remaining properties, DEFENDANT failed to meaningfully perform legal services in the Gomez Action—the matter for which he had originally been engaged through the MetLife plan. (*See ¶17*).

**70.** On June 7th, 2025, PLAINTIFF expressed concern to DEFENDANT that no substantive action had been taken in the Gomez Action and that an upcoming hearing was approaching. Only then did DEFENDANT present PLAINTIFF with a new retainer agreement specifically referencing the Gomez Action. (*Ex. 23 — Retainer Ravada Gomez Dated June 7th, 2025*)

**71.** A hearing in the Gomez Action was scheduled on or about June 7, 2025. On that same date, DEFENDANT informed PLAINTIFF he was too busy to appear and instructed PLAINTIFF to sign a substitution of attorney and appear in court. (*Ex. 24 Substitute Email*)

**72.** DEFENDANT represented to PLAINTIFF that the substitution paperwork would be properly filed and effective. Relying on those representations, PLAINTIFF appeared in court on June 7, 2025, as instructed.

**73.** Upon appearance, PLAINTIFF learned that the substitution of attorney had not been properly submitted and had been rejected by the clerk. PLAINTIFF appeared without valid representation, could not proceed as DEFENDANT had represented, and suffered loss of credibility before the court. (*Ex. 25 - June 7, 2025, Clerk Rejection / Hearing Documentation*.)

**74.** DEFENDANT did not appear at the hearing, did not cure the defective filing, and did not take corrective action to protect PLAINTIFF's litigation posture following the hearing.

**75.** On or about July 17, 2025, PLAINTIFF discovered a notice posted on her door relating to eviction and abandonment. (*Ex. 4 Page 62 – Text Messages: Eviction Notice*)

**76.** PLAINTIFF contacted DEFENDANT seeking clarification and assistance. DEFENDANT minimized the situation, characterized PLAINTIFF's concerns as misunderstandings, and insisted that communications proceed on his terms, while continuing to discourage direct contact with the lender or servicer. (*See Id.*).

**77.** DEFENDANT's conduct—viewed as a whole—reflects continued neglect of litigation duties, ongoing self-interested steering in property matters, and a pattern of actions and omissions that directly contributed to PLAINTIFF's loss of housing stability, legal standing, and financial stability.

COMPLAINT

78. On or about **July 17, 2025**, after discovering an eviction-related notice posted at her residence and after weeks of inaction, conflicting instructions, and abandonment by DEFENDANT, **PLAINTIFF filed a formal complaint with the State Bar of California** concerning DEFENDANT's conduct, including his conflicts of interest, self-dealing, failure to fund the foreclosure reinstatement as promised, and abandonment of her legal matters. (*See Ex. 26 – Complaint Submitted to State Bar of California*).

79. Following DEFENDANT's continued failure to take corrective action, **PLAINTIFF independently undertook efforts to address the foreclosure consequences**, including directly communicating with **Select Portfolio Servicing ("SPS")**, the loan servicer, without DEFENDANT's assistance or involvement. (*Ex. 27 – Plaintiff Ongoing Communication with Lender and Trustee*).

80. Through PLAINTIFF's own efforts—despite lacking legal representation, despite having lost her employment, and despite DEFENDANT's prior discouragement of direct lender engagement—**PLAINTIFF was able to obtain rescission of the foreclosure sale** affecting her primary residence. (*Ex. 28 – Notice of Rescission of Deed Upon Sale Dated July 29th 2025*)

81. The rescission of the foreclosure sale was achieved **solely through PLAINTIFF's independent actions** and **not as a result of any assistance, advocacy, or remedial conduct by DEFENDANT**, who had failed to fund the reinstatement, failed to engage the lender or trustee, and failed to protect PLAINTIFF's interests during the critical pre- and post-sale period.

82. PLAINTIFF's ability to mitigate catastrophic loss on her own does not excuse DEFENDANT's misconduct. To the contrary, it underscores that **the foreclosure, eviction exposure, and related damages were the direct result of DEFENDANT's failures**, and that relief was obtained only after PLAINTIFF removed DEFENDANT from any role in addressing the foreclosure.

83. DEFENDANT's abandonment forced PLAINTIFF to act in propria persona under extreme financial and emotional distress to preserve her housing, further evidencing DEFENDANT's breach of fiduciary duty, professional negligence, and the causal connection between DEFENDANT's misconduct and PLAINTIFF's damages.

83.5 As a direct and proximate result of DEFENDANT's breaches of fiduciary duty, professional negligence, and conflicted conduct, PLAINTIFF was forced to intervene and engage directly with multiple third parties to mitigate and undo the harm DEFENDANT caused. These third parties included, without limitation, **Select Portfolio Servicing ("SPS")**, the loan servicer responsible for the foreclosure of PLAINTIFF's primary residence; **Clear Recon Corp.**, the foreclosure trustee; and **Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of CMCE Trust**, and other entities involved in the nonjudicial foreclosure process as well as escrow holders, prospective purchasers, and related real estate participants affected by the clouded title and DEFENDANT's recorded instruments. DEFENDANT's failure to provide the promised reinstatement funding, failure to communicate with the lender or foreclosure trustee, and abandonment of PLAINTIFF's legal matters necessitated PLAINTIFF's direct involvement with these third parties and caused PLAINTIFF to incur legal fees, costs, and related expenses that would not have been required absent DEFENDANT's misconduct. (*See ¶¶42, 63, 79*)

– 13 –

COMPLAINT

**M. PLAINTIFF'S INDEPENDENT ACTIONS, BAR COMPLAINT, AND DEFENDANT'S OPPORTUNISTIC RE-ENTRY**

84.	On or about July 17, 2025, after weeks of inaction, failed funding, and abandonment by DEFENDANT, PLAINTIFF filed a complaint with the State Bar of California concerning DEFENDANT's conduct. (*See ¶78*)

85.	During the same period, and without assistance from DEFENDANT, PLAINTIFF directly engaged with Select Portfolio Servicing ("SPS") regarding the foreclosure of her primary residence and independently took all steps necessary to challenge the sale. (*See ¶¶ 49-53*).

86.	Through her own efforts, PLAINTIFF successfully obtained rescission of the foreclosure sale. DEFENDANT played no role in this outcome, and did not contribute to the legal or factual basis for rescission. (*See ¶¶ 49-53*).

87.	After obtaining confirmation that the foreclosure sale had been rescinded, PLAINTIFF contacted DEFENDANT in an effort to avoid further conflict and, in good faith, withdrew the State Bar complaint.

88.	PLAINTIFF informed DEFENDANT that she was preparing to pursue claims against SPS and that counsel for SPS had initiated settlement discussions directly with her.

89.	Only after PLAINTIFF informed DEFENDANT that she had independently obtained rescission of the foreclosure sale and that settlement discussions with Select Portfolio Servicing ("SPS") were underway did DEFENDANT attempt to reinsert himself into the matter. On or about July 18, 2025, DEFENDANT asserted that it would be "better" for him to communicate directly with SPS's counsel and transmitted a new flat-fee retainer agreement dated July 18, 2025. (See Exhibit 29 – Unsigned Retainer Agreement Dated July 18, 2025.)

90.	The July 18, 2025 retainer sought to retain DEFENDANT to represent PLAINTIFF in litigation and settlement discussions concerning SPS and the foreclosure—matters in which DEFENDANT had not previously acted, contributed, or provided effective assistance, and which PLAINTIFF had already materially advanced without DEFENDANT's involvement. (*See Id*.)

91.	The proposed retainer was transmitted only after DEFENDANT had failed to prevent foreclosure, failed to provide the reinstatement funding he promised, and failed to competently represent PLAINTIFF in prior litigation, and after PLAINTIFF had independently stabilized her housing situation and created settlement leverage through her own efforts.

92.	Shortly thereafter, on or about July 23, 2025, DEFENDANT sent PLAINTIFF a written email proposing that he would prepare and file a complaint and record a lis pendens "pro bono, no fee," purportedly to "*buy time and leverage*," while imposing an artificial same-day deadline tied to DEFENDANT's personal availability and urging immediate oral discussion before any written memorialization. (*See Exhibit 30 – July 23, 2025 Email*.) This communication followed DEFENDANT's attempt to secure paid representation for the same subject matter and reflected a pressure-based effort to reassert control over PLAINTIFF's legal strategy without assuming formal responsibility or accountability as counsel of record.

COMPLAINT

93.     Notably, the compensation terms proposed in the July 18, 2025, retainer were materially more favorable to PLAINTIFF than the rates DEFENDANT previously demanded during periods when PLAINTIFF was under acute financial distress, unemployed, and facing imminent foreclosure which demonstrates opportunistic fee positioning and strategic self-interest rather than client protection. *(See ¶¶ 27, 70, 89; Exs. 29–30).*

94.     PLAINTIFF declined the proposed retainer and terminated DEFENDANT's representation. (*See Ex. 4 Page 80, Texts: Termination of Representation*)

95.     In response, DEFENDANT sent a written communication disparaging PLAINTIFF, questioning her judgment, demanding payment without a final accounting, and failing to comply with his professional obligations upon termination, including prompt and professional disengagement.

96.      DEFENDANT's attempt to reassert control over PLAINTIFF's legal matters after her independent success, following a withdrawn bar complaint, and in the absence of any contribution to the outcome, constituted further breach of fiduciary duty, improper fee solicitation, and self-interested conduct inconsistent with the duties of an attorney.

97.     **On or about September 25, 2025**, after PLAINTIFF had terminated DEFENDANT's representation and after PLAINTIFF had filed a complaint with the State Bar of California concerning DEFENDANT's conduct, DEFENDANT transmitted an invoice purporting to bill PLAINTIFF for legal services in the *Gomez Action* in the amount of **$1,290.00**, calculated at **4.3 hours at $300 per hour**. The invoice was transmitted after months of inaction and only after DEFENDANT learned that PLAINTIFF had independently stabilized her foreclosure matter and no longer required DEFENDANT's involvement.

98.     The invoice was materially false and misleading. Among other charges, DEFENDANT billed **1.5 hours for "Attended Trial Setting Conference" on July 16**, despite the fact that DEFENDANT had previously instructed PLAINTIFF to appear in court in his place, had assured PLAINTIFF that a substitution of attorney would be properly filed, and had **failed to file that substitution correctly**, resulting in rejection by the clerk and PLAINTIFF appearing without valid representation. DEFENDANT did not appear as counsel of record at that hearing and did not perform the billed service. (*See ¶¶ 71-74*)

99.     DEFENDANT further billed for preparation of a substitution of attorney form on June 7, 2025, notwithstanding that the form was improperly submitted, rejected by the clerk, and never effectuated. The billing therefore sought compensation for work that was either not performed, not completed competently, or affirmatively caused harm to PLAINTIFF by undermining her credibility before the court. (*See ¶¶ 71-74*).

100.     The timing, content, and nature of the invoice demonstrate that it was transmitted **in retaliation** for PLAINTIFF's termination of DEFENDANT, withdrawal from further engagement, and complaint to the State Bar, rather than as a good-faith billing for services rendered. At the time the invoice was sent, no enforceable written fee agreement governed the Gomez Action, and DEFENDANT had previously acknowledged delaying billing "because of the circumstances." The invoice therefore constitutes retaliatory conduct, improper fee practices, and an additional breach of DEFENDANT's fiduciary duties to PLAINTIFF.

101.    As a result of the foregoing, the transaction documents and recorded instruments prepared, transmitted, and procured by DEFENDANT while acting in a fiduciary capacity—including grant deeds, deeds of trust, promissory notes, assignments of rents, powers of attorney, and recorder-facing "purchase" forms—are subject to rescission, cancellation, and quiet title relief because they were obtained through an attorney–client transaction conferring advantages on DEFENDANT without the disclosures, fairness safeguards, and meaningful independent-counsel opportunity required for attorney self-dealing transactions, and because the essential inducement for the transaction—timely reinstatement funding to prevent foreclosure—was not performed as promised.

### N.    POST-TERMINATION MISIDENTIFICATION AND DISPARAGING COMMUNICATIONS

102.    On or about September 11th, 2025, PLAINTIFF expressly notified DEFENDANT that her legal name and gender had been lawfully changed, effective September 11, 2025, and that her legal name is **Luna D'Sol**. From the inception of the parties' relationship through termination of representation, DEFENDANT had never once addressed PLAINTIFF in any email salutation or written communication as "AKA," by her former name, or in any dual-name format. Notwithstanding this established course of conduct and DEFENDANT's actual knowledge of PLAINTIFF's legal name and gender change, on or about November 5, 2025—after termination of representation—DEFENDANT transmitted a written email communication addressed to "*Luna AKA Julio Ravada.*"*(See Ex*

103.    DEFENDANT's use of PLAINTIFF's former name after receiving explicit notice of her legal name and gender change, and after never having used such a designation during the attorney–client relationship, was intentional and undertaken with conscious disregard for PLAINTIFF's rights and dignity. The misidentification served no legitimate legal, administrative, or communicative purpose and occurred in the context of post-termination disputes concerning fees, accounting, and DEFENDANT's professional conduct. DEFENDANT's conduct was willful, oppressive, and demeaning, and constituted malicious or reckless disregard of PLAINTIFF's rights, thereby supporting an award of punitive damages pursuant to Civil Code section 3294.

104.    The foregoing factual allegations give rise to the following causes of action against DEFENDANT based on his breaches of fiduciary duty, professional negligence, and related misconduct, as set forth below.

### IV
### VOID AND VOIDABLE TRANSACTIONAL INSTRUMENTS
### (EQUITABLE ALLEGATIONS APPLICABLE TO ALL CLAIMS)

105.    PLAINTIFF realleges and incorporates by reference paragraphs 1 through 104 as though fully set forth herein.

///

///

///

- 16 -

COMPLAINT

106.    The transaction instruments prepared, transmitted, and implemented by DEFENDANT—including grant deeds, deeds of trust, promissory notes, PCORs, assignments of rents, and powers of attorney (collectively, the "Transaction Instruments")—arose from an attorney–client business transaction in which DEFENDANT acquired interests adverse to PLAINTIFF while acting as her legal counsel. (*See, e.g., ¶¶17–21, 31–48, 63–68.*)

107.    Under California law and the California Rules of Professional Conduct, transactions in which an attorney enters into a business transaction with a client or acquires an ownership, possessory, security, or other pecuniary interest adverse to a client are presumptively invalid unless the attorney proves strict compliance with CRPC Rule 1.8.1, including that the terms were fair and reasonable to the client, fully disclosed and transmitted in writing in a manner reasonably understandable to the client, and that the client provided informed written consent after being advised of and afforded a reasonable opportunity to seek independent counsel. *California courts strictly enforce these requirements and place the burden on the attorney to prove fairness and compliance, and failure to do so renders the transaction voidable or unenforceable. (See Fair v. Bakhtiari (2011) 195 Cal.App.4th 1135, 1154–1157; Fletcher v. Davis (2004) 33 Cal.4th 61, 69–72.)"*

### A.    INSTRUMENTS VOID OR UNENFORCEABLE

108.    The Transaction Instruments are void and/or unenforceable to the extent they were procured and implemented through DEFENDANT's conflicted attorney–client business transaction without compliance with CRPC Rule 1.8.1, including the absence of fair and reasonable terms and the absence of a complete, integrated written disclosure of material terms and risks before execution. (See ¶¶25–30, 36–48.)

109.    The Transaction Instruments further lack lawful consideration and/or failed for lack of consideration. DEFENDANT represented that the purpose of the transaction was to provide reinstatement funds sufficient to stop the foreclosure (¶¶49–52), yet the wire was canceled and the reinstatement funds were not delivered (¶¶51–52), and PLAINTIFF's residence was sold at foreclosure (¶53). The failure of the promised funding defeated the essential inducement for execution and supports rescission and cancellation.

110.    Certain Transaction Instruments were incomplete, misleading, and/or internally inconsistent at the time DEFENDANT pressed for execution and recording, including but not limited to deeds that expressly incorporated missing attachments (¶37), recorder-facing instruments characterizing the transfers as "purchases" without any purchase agreement, escrow, or arms-length negotiation (¶¶40–41, 58), and later-expanded security and control instruments transmitted under time pressure without written explanation or comparison (¶¶42–48). These defects further support cancellation and render the instruments unenforceable as implemented.

111.    In addition to being void or unenforceable as alleged above, and in the alternative, the Transaction Instruments are voidable at PLAINTIFF's election because they were procured through DEFENDANT's undue influence, constructive fraud, and breach of fiduciary duty, arising from DEFENDANT's superior position of trust and authority as PLAINTIFF's attorney, the absence of informed consent, and the coercive circumstances under which execution was obtained. *(See ¶¶17–21, 25–30, 36–48.)*

COMPLAINT

**B.     INSTRUMENTS VOIDABLE FOR UNDUE INFLUENCE, CONSTRUCTIVE FRAUD, AND BREACH OF FIDUCIARY DUTY**

112.    In the alternative, and at minimum, the Transaction Instruments are voidable at PLAINTIFF's election because they were procured through DEFENDANT's undue influence, constructive fraud, and breach of fiduciary duty, arising from DEFENDANT's superior position of trust and authority as PLAINTIFF's attorney, the absence of informed consent, and the coercive circumstances under which execution was obtained. (*See ¶¶17–21, 25–30, 36–48*).

113.    DEFENDANT's conduct constitutes undue influence within the meaning of **Civil Code § 1575**, in that DEFENDANT used (a) his fiduciary authority as PLAINTIFF's attorney, (b) PLAINTIFF's distress and necessity arising from imminent foreclosure, and (c) unfair advantage obtained through manipulation of timing, disclosure, and document sequencing, to overcome PLAINTIFF's free will and procure execution of instruments conferring substantial benefits on DEFENDANT. Such conduct renders the Transaction Instruments voidable as a matter of law, and shifts the burden to DEFENDANT to prove the transaction was fair, voluntary, and free from undue influence. *(See ¶¶ 14, 17-19, 25-30, 35-54).*

114.    DEFENDANT's conduct further satisfies the statutory definition of undue influence under **Welfare & Institutions Code § 15610.70**, including:

a.     **Vulnerability of the Victim:** PLAINTIFF was acutely vulnerable due to imminent foreclosure, severe financial distress, job instability, and lack of meaningful time to seek independent legal advice, all of which were known to DEFENDANT. (See ¶¶14, 36, 48.)

b.     **Authority of the Influencer:** DEFENDANT held himself out as PLAINTIFF's attorney through an employer-sponsored legal plan, occupied a position of trust and confidence, and controlled access to legal advice during a time-sensitive crisis. (See ¶¶17–21.)

c.     **Actions or Tactics Used:** DEFENDANT employed coercive tactics including late-night transmission of materially different document sets, withholding explanation of legal consequences, escalating demands for additional property interests, and imposing an early-morning recording deadline immediately preceding foreclosure. (See ¶¶36–48.)

d.     **Inequitable Result:** The resulting transaction imposed grossly one-sided terms favoring DEFENDANT, including disproportionate ownership transfers, expansive lien and control rights, and exposure of PLAINTIFF's primary residence to foreclosure without delivery of the promised reinstatement funds. (See ¶¶31–45, 49–53.)

115.    Independently and in addition, DEFENDANT's conduct constitutes constructive fraud. As PLAINTIFF's fiduciary, DEFENDANT owed duties of full disclosure, candor, and utmost good faith. DEFENDANT breached those duties by omitting material facts, mischaracterizing the nature of the transactions, transmitting incomplete or misleading instruments, and advancing self-interested arrangements while continuing to act as PLAINTIFF's attorney, thereby obtaining an advantage to PLAINTIFF's prejudice.

COMPLAINT

116. DEFENDANT's undue influence, constructive fraud, and fiduciary breaches render the Transaction Instruments subject to rescission under **Civil Code § 1689(b)**, including but not limited to subdivisions **(1)** and **(2)**, because PLAINTIFF's consent was obtained through undue influence and because the consideration for the transaction failed in a material respect. Where a party's apparent consent is procured through fiduciary overreach, coercive timing, or manipulation of vulnerability, such consent is not legally effective, and rescission is warranted to restore the parties to their pre-transaction positions. The Transaction Instruments therefore must be rescinded and canceled to prevent DEFENDANT from retaining benefits obtained through inequitable conduct and to unwind a transaction induced under circumstances that vitiate voluntary assent. (*See ¶¶36–53, 109–112.*)

### C. INEFFECTIVENESS OF WAIVER/RETAINER TO CURE INVALIDITY

117. Any conflict waiver and/or retainer documents transmitted by DEFENDANT do not validate, ratify, or cure the invalidity or voidability of the Transaction Instruments because they did not disclose the complete transaction structure ultimately imposed, did not attach or incorporate the operative instruments and their material terms, and did not suspend conflicted conduct pending meaningful independent review. (*See ¶¶25–30, 42–48, 63–68.*)

### D. ENTITLEMENT TO CANCELLATION, RESCISSION, RECONVEYANCE, AND QUIET TITLE

118. Because the Transaction Instruments are void, unenforceable, or voidable, PLAINTIFF is entitled to rescission, cancellation of instruments, reconveyance, restoration of title and property interests, quiet title relief, and injunctive relief as necessary to prevent DEFENDANT from asserting rights under instruments procured through fiduciary breach.

### E. NO INFORMED CONSENT

119. At no time did PLAINTIFF provide informed, voluntary consent to DEFENDANT's conflicted conduct or proposed transactions. DEFENDANT did not provide PLAINTIFF with a full and fair written disclosure explaining, in a manner reasonably understandable to PLAINTIFF, the material risks, disadvantages, and reasonably available alternatives to DEFENDANT's proposed financial involvement, including the risks inherent in transferring ownership interests, granting liens, assigning rents, executing powers of attorney, or ceding control to DEFENDANT while he continued to act as PLAINTIFF's attorney. DEFENDANT did not advise PLAINTIFF of her right to independent counsel or provide a meaningful opportunity to obtain such counsel, and did not suspend the conflicted conduct pending independent review. Instead, DEFENDANT pressed for execution under extreme time pressure while PLAINTIFF faced imminent foreclosure. (*See ¶¶25–30, 36–48.*)

///

///

///

- 19 -

COMPLAINT

## V
## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty**
*(Against Defendant Jae H. Kim, Esq.)*

**120.**    PLAINTIFF realleges and incorporates by reference paragraphs 1 through 119, inclusive, as though fully set forth herein.

**121.**    DEFENDANT's conduct was intentional, willful, malicious, and carried out with conscious disregard for PLAINTIFF's rights. In addition to the self-dealing and fiduciary breaches alleged above, DEFENDANT engaged in retaliatory and demeaning conduct toward PLAINTIFF after termination of representation, including knowingly misidentifying PLAINTIFF by her former legal name despite actual notice of her lawful name and gender change. (*See ¶¶102–103.*) DEFENDANT's conduct constitutes oppression, fraud, and malice within the meaning of Civil Code section 3294, thereby justifying an award of punitive and exemplary damages. By virtue of the attorney–client relationship, DEFENDANT owed PLAINTIFF the highest fiduciary duties known to law, including the duties of undivided loyalty, absolute candor, and the avoidance of even the appearance of a conflict of interest. Pursuant to **California Probate Code section 16004(c)**, because DEFENDANT entered into transactions and acquired interests adverse to PLAINTIFF during the existence of the fiduciary relationship, the Transaction Instruments are **presumptively a product of undue influence and a breach of fiduciary duty**, shifting the burden to DEFENDANT to prove the transactions were fair, reasonable, and fully disclosed.

**122.**    At all relevant times, DEFENDANT knew PLAINTIFF was in a state of "acute vulnerability" due to imminent foreclosure and financial distress. DEFENDANT further knew that PLAINTIFF sought protection through an employer-sponsored legal plan (MetLife) specifically to ensure conflict-free, ethical representation. DEFENDANT's bypass of this plan to solicit undocumented "Zelle" payments and personal equity positions constitutes a predatory violation of the very fiduciary protections PLAINTIFF sought to employ. **(**See *¶¶14, 17–19, 22, 25–26, 36–38, 49–54.*).

**123.**    DEFENDANT breached his fiduciary duties by engaging in conflicted conduct and self-dealing while continuing to act as PLAINTIFF's attorney, including but not limited to:

a. **Diverting Representation:** Shifting the focus from the *Gomez* litigation to the predatory acquisition of PLAINTIFF's home equity (*See ¶¶13-24*);

b. **Self-Dealing:** Soliciting, drafting, and recording grant deeds and liens for his own benefit while PLAINTIFF remained his client **As a result of this conduct, DEFENDANT breached the absolute duty of undivided loyalty owed to PLAINTIFF by intentionally placing his own pecuniary interests in direct competition with PLAINTIFF's ownership and equity interests, thereby abandoning his role as an advocate and assuming the posture of a predatory adversary while representation nominally continued.** (*See ¶¶20-21, 31-35)*;

c. **Soliciting / Preparing Instruments:** Soliciting, preparing, and directing the execution and recordation of grant deeds, deeds of trust, promissory notes, assignments of rents, powers of attorney, and related instruments that conferred ownership, lien, and control interests adverse to PLAINTIFF (*See ¶¶31-48, 63-68)*;

d. **Interference with Financial Data:** Misusing PLAINTIFF's confidential financial disclosures—provided for legal defense—to structure DEFENDANT's personal acquisition of her assets (*See ¶¶25-26)*.

e. **MetLife / Zelle Payments:** Demanding and accepting out-of-plan payments, including undocumented Zelle payments, without written authorization, billing disclosures, or compliance with the MetLife plan's requirements (*See ¶¶22)*.

f. **Coerced Execution:** Engineering "midnight transmissions" of complex documents to be signed by 8:00 a.m., intentionally depriving PLAINTIFF of the "reasonable opportunity" to seek independent counsel required by **CRPC Rule 1.8.1** (*See ¶¶36-48)*.

g. **Failure to Withdraw / Conflict-Free Advice:** Failing to provide conflict-free advice, failing to withdraw from representation once DEFENDANT's personal interests became adverse, and continuing to direct PLAINTIFF's actions while pursuing personal financial benefit failing to provide conflict-free advice, **failing to withdraw from representation or formally terminate the attorney–client relationship once DEFENDANT's personal interests became adverse**, and continuing to direct PLAINTIFF's legal and transactional actions while pursuing personal financial benefit. (*See ¶¶55-62, 69-74)*.

h. **Procuring Void Waivers:** Procuring a purported conflict waiver and retainer agreement after the conflict had already arisen and been acted upon, without full and fair disclosure of material terms, risks, and alternatives, and without a meaningful opportunity for PLAINTIFF to obtain independent counsel (*See ¶¶ 27-30, 36-48)*.

i. **Failure of Consideration and Abandonment**: Representing that essential reinstatement funding would be provided to stop foreclosure, inducing PLAINTIFF to execute and record Transaction Instruments in reliance on that representation, and then intentionally withdrawing/canceling those funds without providing substitute funding or emergency legal intervention, directly resulting in the catastrophic foreclosure and loss of PLAINTIFF's residence. (See ¶¶49-53).

124. Any purported conflict waiver procured by DEFENDANT is void as a matter of law because it was obtained through **Constructive Fraud**. DEFENDANT failed to disclose the "actual and reasonably foreseeable adverse consequences" of the transaction, failed to explain the risks of the specific instruments (e.g., Powers of Attorney and Assignments of Rents), and failed to advise PLAINTIFF that she was effectively surrendering her home to her own lawyer.

125. Pursuant to California Probate Code section 16004(c), because DEFENDANT obtained a personal advantage and acquired interests adverse to PLAINTIFF through the Transaction Instruments while acting in a fiduciary capacity as PLAINTIFF's attorney, the transactions are presumptively the product of undue

influence and a breach of fiduciary duty. The burden therefore shifts to DEFENDANT to prove that the transactions were fair, voluntary, fully informed, and free from undue influence.

126.    DEFENDANT's conduct was not merely negligent but was **oppressive and malicious** under **Civil Code section 3294**. Following the collapse of the transaction, DEFENDANT engaged in a pattern of "identity-based retaliation," intentionally and repeatedly misgendering PLAINTIFF and using her former legal name in official communications despite actual notice of her lawful name and gender change. This conduct was designed to demean, harass, and exert "litigation-based bullying" against a former client, proving a conscious disregard for PLAINTIFF's dignity and rights. *(See ¶¶78–79, 84–88, 95–100, 102–103.)*

127.    As a direct and proximate result of DEFENDANT's breaches, PLAINTIFF has suffered:
   a. **Total Loss of Property:** The foreclosure and loss of her primary residence;
   b. **Clouded Title:** Impairment of title on remaining properties;
   c. **Economic Loss:** Loss of equity, rental income, and out-of-pocket "Zelle" payments;
   d. **Emotional Distress:** Severe mental anguish caused by the betrayal of a fiduciary and the loss of her home.

128.    DEFENDANT's conduct was intentional, willful, and carried out with conscious disregard for PLAINTIFF's rights, including DEFENDANT's express acknowledgment at the time he transmitted the conflict waiver that the conduct could "get him in trouble," followed by his decision to proceed anyway, continue preparing adverse instruments, and press for execution under time pressure, thereby justifying the imposition of punitive damages pursuant to Civil Code section 3294. (*See ¶27*)

129.    By reason of these breaches, PLAINTIFF is entitled to **total fee forfeiture and disgorgement**, the imposition of a **constructive trust** over any interests held by DEFENDANT, compensatory damages according to proof, and **punitive damages** to punish and deter DEFENDANT's egregious abuse of the legal profession's "sacred trust."

## SECOND CAUSE OF ACTION

### (Professional Negligence / Legal Malpractice)

*(Against Defendant Jae H. Kim, Esq.)*

130.    PLAINTIFF realleges and incorporates by reference paragraphs 1 through 129, inclusive, as though fully set forth herein.

131.    An attorney–client relationship existed between PLAINTIFF and DEFENDANT beginning on or about April 29, 2025, when DEFENDANT accepted PLAINTIFF's request for legal assistance through Bank of America's MetLife Prepaid Legal Plan in connection with the pending civil action styled *Gomez v. Ravada* (the "Gomez Action"). DEFENDANT thereafter communicated with PLAINTIFF regarding that matter, requested and received pleadings and case materials, and held himself out as providing legal services in connection with the Gomez Action. (*See ¶17-19*)

- 22 -

COMPLAINT

132.    As PLAINTIFF's attorney, DEFENDANT owed PLAINTIFF a duty to exercise the level of skill, prudence, diligence, and competence commonly possessed and exercised by reasonably careful California attorneys under similar circumstances, including duties to:

   a. timely review pleadings and procedural posture;

   b. advise the client regarding defenses, deadlines, and litigation strategy;

   c. act within the authorized scope of representation;

   d. avoid conflicts that materially impair professional judgment; and

   e. refrain from conduct that foreseeably compromises the client's legal position.

   f. Adhere to the protocols and ethical safeguards of employer-sponsored legal plans to ensure the client receives the benefit of the bargained-for representation without unauthorized surcharges.

133.    DEFENDANT breached the applicable standard of care by, among other acts and omissions:

   a. **Failing to timely and competently perform core litigation tasks** in the Gomez Action, including reviewing the summons and complaint, advising PLAINTIFF regarding defenses, procedural obligations, or next steps, and providing litigation strategy consistent with the scope of the MetLife engagement;

   b. **Mismanaging basic case handling**, including requesting re-transmission of pleadings he had already received, expressing confusion regarding case status, and failing to demonstrate familiarity with the procedural posture of the Gomez Action;

   c. **Diverting attention and communications away from the Gomez Action** and toward PLAINTIFF's real estate holdings and potential financial transactions, while the litigation remained pending and unresolved;

   d. **Allowing personal financial interests and prospective transactions** to interfere with the exercise of independent professional judgment required for competent litigation representation;

   e. **Failing to advise PLAINTIFF to seek independent counsel or to withdraw** when DEFENDANT's ability to provide competent, conflict-free legal services became materially impaired; and

   f. **Operating outside the structure and safeguards of the employer-sponsored legal benefit plan**, including conditioning access to services on undocumented payments and engaging in off-plan conduct inconsistent with the standard of care.

   g. Failing to timely and properly prepare, file, and effectuate a substitution of attorney in the Gomez Action despite representing to PLAINTIFF that such substitution would be effective, resulting in PLAINTIFF appearing pro se at a critical court proceeding without notice, constituting a **total abandonment** of the client at a critical stage of litigation.

**134.**    DEFENDANT's negligence was not the result of reasonable tactical judgment. Rather, it arose from divided loyalties, distraction by personal financial objectives, and failure to adhere to basic professional obligations governing litigation representation. DEFENDANT's negligence was a direct result of **divided loyalties**, where DEFENDANT subordinated his professional duty to defend the *Gomez* Action to his personal pursuit of PLAINTIFF's equity, thereby rendering competent representation impossible

**135.**    **Causation.** As a direct and proximate result of DEFENDANT's negligent acts and omissions, PLAINTIFF suffered actual harm, including but not limited to:

    a.    Loss of the benefit of competent, timely legal representation in the Gomez Action during a critical period (*See ¶¶ 17-19, 23, 69-70)*;

    b.    Increased litigation exposure, stress, and uncertainty caused by the absence of meaningful legal guidance (*See ¶¶ 17-18, 23, 69-70)*;

    c.    The need to address the Gomez Action without the benefit of the services for which PLAINTIFF had retained DEFENDANT through the MetLife plan (*See ¶¶ 20-24, 31-35)*;

    d.    Foreseeable entanglement of litigation decision-making with conflicted, property-centered conduct that compromised PLAINTIFF's legal position (*See ¶¶ 21, 31-35, 55-62)*;

    e.    Additional financial and remedial costs incurred to mitigate the consequences of DEFENDANT's negligence, according to proof (*See ¶¶ 25-30, 36-48)*; and,

    f.    Material prejudice to PLAINTIFF's defenses and procedural standing in the *Gomez* Action, including the loss of [mention a specific deadline or hearing outcome], which would have been avoided had DEFENDANT exercised reasonable skill and care (*See ¶¶ 2, 17, 22, 25-27)*.

**136.**    PLAINTIFF reasonably relied on DEFENDANT's conduct, representations, and professional role as an attorney obtained through an employer-sponsored legal services plan and had no reason to believe that DEFENDANT would neglect the Gomez Action or subordinate it to personal financial interests.

**137.**    But for DEFENDANT's negligence, abandonment, and conflicted conduct, PLAINTIFF would not have suffered the loss of legal standing, procedural prejudice, and litigation harm in the Gomez Action. DEFENDANT's failures deprived PLAINTIFF of the very legal protections she sought through the MetLife Legal Plan and directly caused the adverse litigation posture that followed. Specifically:

**(a)** Had DEFENDANT performed the basic litigation services for which he was retained—including timely review of pleadings, calendaring deadlines, and preparation of a responsive pleading or motion—PLAINTIFF would have timely appeared through counsel, preserved available defenses, and avoided procedural exposure in the Gomez Action.

**(b)** Had DEFENDANT properly prepared, filed, and effectuated a substitution of attorney, or appeared as counsel as represented, PLAINTIFF would not have been forced to appear unrepresented at a critical court proceeding, would not have suffered loss of credibility before the court, and would have maintained her procedural and strategic standing as a represented litigant.

COMPLAINT

**(c)** Instead, DEFENDANT abandoned the Gomez Action while diverting PLAINTIFF's attention, trust, and financial resources toward self-interested real estate transactions and undocumented Zelle payments, thereby subordinating PLAINTIFF's litigation interests to DEFENDANT's personal financial objectives. This divided loyalty and abandonment was the **sole and proximate cause** of PLAINTIFF's litigation-related damages.

As a direct result of DEFENDANT's conduct, PLAINTIFF was deprived of competent, conflict-free representation at a critical stage of litigation and was materially worse positioned to defend, negotiate, or resolve the Gomez Action than she would have been had DEFENDANT acted competently.

**138.** PLAINTIFF seeks all relief available at law and in equity, including compensatory damages, costs, interest, and such further relief as the Court deems just and proper. The damages alleged include loss of litigation leverage, increased exposure, remedial legal costs, and foreseeable emotional distress attendant to being left unrepresented at a critical stage of pending litigation.

### THIRD CAUSE OF ACTION

### Cancellation of Instruments (Civil Code § 3412) and Declaratory Relief

*(Against Defendant Jae H. Kim, Esq.; Does 1–25)*

**139.** PLAINTIFF realleges and incorporates by reference paragraphs 1 through 138, inclusive, as though fully set forth herein.

**140.** Beginning on or about May 18–19, 2025, DEFENDANT prepared, directed, transmitted, and caused PLAINTIFF to execute and record multiple written instruments affecting title to and interests in PLAINTIFF's real property, including but not limited to grant deeds, deeds of trust, promissory notes, preliminary change of ownership reports ("PCORs"), powers of attorney, and related recorder forms (collectively, the "Subject Instruments").

**141.** The Subject Instruments purport to transfer ownership interests, create lien rights, assign control, and encumber PLAINTIFF's properties in favor of DEFENDANT and/or entities or trusts controlled by DEFENDANT. These instruments were drafted, structured, sequenced, and presented entirely by DEFENDANT while he was acting as PLAINTIFF's attorney.

///

///

///

///

- 25 -

COMPLAINT

142.    The Subject Instruments are void or, at minimum, voidable under Civil Code section 3412 because their execution and recordation were procured through DEFENDANT's breach of fiduciary duty, undisclosed self-dealing, coercive time pressure, lack of informed consent, and material nondisclosure of essential terms, including but not limited to valuation, lien scope, consideration, management control, exit conditions, and reconveyance rights. The Subject Instruments arose from an attorney–client business transaction in which DEFENDANT acquired interests adverse to PLAINTIFF without strict compliance with the mandatory safeguards of California Rules of Professional Conduct Rule 1.8.1, including the requirements that the terms be fair and reasonable, fully disclosed in writing, and that PLAINTIFF be advised of and afforded a meaningful opportunity to seek independent legal counsel. As a result, the Subject Instruments are presumptively invalid, impair PLAINTIFF's title and property rights, and constitute a cloud on title that must be canceled to prevent serious and ongoing injury. (See ¶¶ 17–21, 25–30, 36–48.)

143.    At the time the Subject Instruments were transmitted and executed, PLAINTIFF was facing an imminent foreclosure sale of her primary residence and required immediate funds to reinstate her mortgage. DEFENDANT knew of this urgency and used it to induce execution of instruments without providing a complete, integrated written agreement explaining how the documents operated together or how PLAINTIFF's equity and property rights would be protected.

144.    The Subject Instruments were transmitted in a staggered and coercive manner, including late-night transmissions on May 19, 2025, and contained materially different and expanded terms from prior versions, thereby preventing meaningful review or consultation with independent counsel. Several instruments expressly incorporated attachments or exhibits that were not provided at the time of execution, rendering the documents incomplete and misleading on their face. The instruments further contained internal inconsistencies concerning consideration, transaction characterization, and purported purchase terms. As a result, the Subject Instruments do not accurately or reliably reflect any mutual agreement between the parties and create a false and misleading appearance of valid ownership or lien rights. The continued existence of these facially defective instruments in the public record constitutes a cloud on title and gives rise to a reasonable apprehension of serious injury to PLAINTIFF's property rights, warranting cancellation pursuant to Civil Code section 3412 and quiet title relief based on the facts alleged herein and verified by PLAINTIFF. (¶¶*36-48*).

145.    Any purported conflict waiver or retainer agreement obtained by DEFENDANT did not validate or authorize the Subject Instruments. The conflict had already arisen and been acted upon before any waiver was transmitted; the waiver did not disclose all material terms of the transactions; and it did not result in informed, voluntary consent under California law.

///

///

///

- 26 -

COMPLAINT

146.    The continued existence of the Subject Instruments in the public record causes serious, immediate, and ongoing harm to PLAINTIFF, including but not limited to clouded title, impaired marketability, interference with refinancing or sale, exposure to tax, lien, and enforcement consequences, and loss of control over core property rights. The Subject Instruments create a reasonable apprehension of serious injury within the meaning of Civil Code section 3412 because they purport to effectuate a wrongful and predatory transfer of ownership, lien priority, and control arising from fiduciary breach and undue influence. Unless canceled, the Subject Instruments threaten permanent loss of PLAINTIFF's equity and real estate interests and enable DEFENDANT to assert adverse claims that are inconsistent with PLAINTIFF's lawful title and ownership.

147.    The real property that is the subject of this quiet title claim consists of the Subject Properties identified above in ¶15 which are located in Los Angeles and Riverside Counties, including:

a.    **2275 East Belding Drive, Palm Springs, California 92262**, APN **502-042-005**;

b.    **6540 Hayvenhurst Avenue, Unit 22, Van Nuys, California 91406**, APN **2231-004-040**; and

c.    **13236 Klein Court, Sylmar, California 91342**, APN **2513-027-069**,

as more fully described in **Exhibit A** attached hereto and incorporated by reference.

148.    PLAINTIFF claims title to the Subject Properties in **fee simple absolute**, free and clear of any ownership, lien, security, management, or control interest asserted by DEFENDANT, except as may appear of record independent of the challenged Transaction Instruments. PLAINTIFF's title is derived from lawful ownership and is superior to any interest claimed by DEFENDANT.

149.    DEFENDANT Jae H. Kim, Esq., JHK Law, APC, and DOES 1–25 claim, or purport to claim, adverse interests in the Subject Properties through grant deeds, deeds of trust, assignments of rents, powers of attorney, PCORs, and related instruments prepared, transmitted, and/or recorded in May and June 2025 (the "Subject Instruments"). PLAINTIFF contends that such adverse claims are **void, voidable, unenforceable, and the product of fiduciary breach, undue influence, constructive fraud, lack of informed consent, and failure of consideration**, as alleged herein.

150.    PLAINTIFF seeks to quiet title **as of May 19–20, 2025**, the period during which DEFENDANT procured execution and recordation of the Subject Instruments under coercive and unlawful circumstances, and **prior to any adverse interest claimed by DEFENDANT** arising from those instruments.

151.    PLAINTIFF seeks a judicial determination of all adverse claims to the Subject Properties pursuant to Code of Civil Procedure section 760.020, and a judgment declaring that DEFENDANT and DOES 1–25 have **no right, title, estate, lien, or interest** in the Subject Properties by virtue of the Subject Instruments or otherwise.

152.    PLAINTIFF is entitled to a judicial determination declaring that the Subject Instruments are void or voidable and ordering their cancellation, expungement, reconveyance, or other appropriate relief to remove any cloud on title and restore PLAINTIFF's property rights.

153.    PLAINTIFF seeks declaratory relief pursuant to Code of Civil Procedure section 1060 to determine the respective rights and obligations of the parties with respect to the Subject Instruments. An actual and present controversy exists because DEFENDANT continues to claim and assert ownership, lien, and control rights arising from the Subject Instruments, while PLAINTIFF contends that those instruments are void, voidable, or unenforceable as a result of DEFENDANT's breaches of fiduciary duty, undisclosed conflicts of interest, lack of informed consent, and violations of governing ethical and statutory duties arising from the attorney–client relationship. PLAINTIFF seeks a judicial declaration that DEFENDANT has no valid ownership, security, possessory, or control interest in PLAINTIFF's properties arising from the Subject Instruments.

154.    PLAINTIFF has no adequate remedy at law. Monetary damages alone cannot fully remedy the continuing harm caused by the existence and enforcement of the Subject Instruments, and equitable relief is necessary to prevent ongoing injury.

155.    The harm caused by the Subject Instruments is not merely historical or compensable by damages. The continued existence of recorded deeds, liens, and control instruments purporting to convey ownership or authority to DEFENDANT creates an ongoing cloud on title, interferes with financing, sale, and lawful possession, and exposes PLAINTIFF to continuing risk of enforcement, tax consequences, and third-party reliance. These injuries are inherently equitable in nature and cannot be fully remedied by monetary damages alone, rendering cancellation and declaratory relief necessary and appropriate under Civil Code § 3412 and Code of Civil Procedure § 1060.]

## FOURTH CAUSE OF ACTION
### Constructive Fraud
### Against Defendant Jae H. Kim and Doe Defendants 1-20

156.    PLAINTIFF realleges and incorporates by reference paragraphs 1 through 155, inclusive, as though fully set forth herein.

157.    At all relevant times, an attorney-client and fiduciary relationship existed between PLAINTIFF and DEFENDANT, whereby DEFENDANT was bound to act in the highest good faith and with due regard for PLAINTIFF's interests.

158.    Pursuant to California Civil Code § 1573, **constructive fraud** is defined as any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault by misleading another to their prejudice.

159.    DEFENDANT breached this fiduciary duty through acts, omissions, and concealments that gained an advantage for himself to PLAINTIFF's severe prejudice. These breaches included, but were not limited to:

   a.   Diverting the scope of representation from the "Gomez Action" to matters concerning PLAINTIFF's personal real estate holdings and financial distress (pp. 2-3);

b.   Failing to provide full and fair written disclosure of all material facts, risks, and consequences of the proposed transaction, including the true nature of the transfers and valuation of equity (pp. 4, 11);

c.   Requesting and receiving confidential financial documentation from PLAINTIFF for the purpose of a proposed transaction adverse to PLAINTIFF's interests (p. 4);

d.   Failing to advise PLAINTIFF in writing to seek and obtain independent legal counsel before entering into any business transaction with her attorney, as required by California Rules of Professional Conduct (pp. 2-3, 11);

e.   Mischaracterizing the transfers as "purchases" on official recorder documents (PCORs) when they were intended to be a temporary financing arrangement (p. 6); and

f.   Transmitting incomplete or materially different transactional documents under time pressure, preventing meaningful review (pp. 5-7).

160.   DEFENDANT knew or should have known that these omissions and misrepresentations were material and that PLAINTIFF would rely upon the information provided and withheld by her fiduciary.

161.   PLAINTIFF justifiably relied upon DEFENDANT's position of trust and superior knowledge as her attorney and was misled by his actions and omissions to her detriment.

162.   As a direct and proximate result of DEFENDANT's constructive fraud, PLAINTIFF sustained significant damages, including the loss of her primary residence to foreclosure, loss of equity in her other properties, and additional financial harm. (pp. 8-9)

## FIFTH CAUSE OF ACTION

### Undue Influence

### Against Defendant Jae H. Kim and Doe Defendants 1-25

163.   PLAINTIFF re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 162, inclusive, as though fully set forth herein.

164.   California Welfare & Institutions Code § 15610.70 defines **undue influence** as excessive persuasion that overcomes a person's free will and results in inequity. To establish this claim, the Court considers four elements: PLAINTIFF's vulnerability, DEFENDANT's apparent authority, the actions/tactics used, and an inequitable result.

165.   **Vulnerability of the Victim:** At all relevant times, PLAINTIFF was highly vulnerable due to acute financial distress, mounting debt, and an imminent foreclosure deadline, leaving her with no practical ability to seek alternative financing or independent legal advice in the time remaining. (pp. 1, 4-5) DEFENDANT was aware of this vulnerability and exploited it.

166.   **Apparent Authority of the Wrongdoer:** DEFENDANT held a position of trust and authority as PLAINTIFF's licensed attorney and fiduciary, a legal professional upon whom PLAINTIFF reasonably depended for critical guidance during this crisis. (p. 2)

COMPLAINT

**167.    Actions and Tactics Used in Unduly Influencing the Victim:** DEFENDANT engaged in a pattern of excessive persuasion and pressure tactics designed to overcome PLAINTIFF's free will, including:

a. Initiating changes in property rights with haste and secrecy (pp. 6-7);

b. Controlling access to information by withholding complete transaction documents until the last minute (p. 6);

c. Using PLAINTIFF's distress as leverage, demanding interests in two properties as a condition of essential financial assistance just two days before the foreclosure sale (p. 5); and

d. Utilizing affection and intimidation, including framing legal decisions in terms of the impact on "me and my wife and our relationship as well" (p. 8).

**168.    Inequitable Result:** The transaction imposed by DEFENDANT resulted in a grossly inequitable outcome, including the intended transfer of 95% ownership in one property for no upfront consideration and the eventual loss of PLAINTIFF's primary residence through foreclosure caused by DEFENDANT's failed funding promises. (pp. 5, 8)

**169.    As a direct and proximate result of DEFENDANT's undue influence, the Transaction Instruments are voidable, and PLAINTIFF has suffered substantial monetary damages in an amount to be proven at trial.

### VI

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE, PLAINTIFF Luna D'Sol respectfully prays for judgment against DEFENDANT Jae H. Kim, Esq., JHK Law, APC, and DOES 1 through 25, inclusive, as follows:**

1. **For Declaratory Relief** pursuant to Code of Civil Procedure section 1060, declaring the respective rights and obligations of the parties, including a declaration that DEFENDANT has no valid ownership, lien, security, management, or control interest arising from the challenged transaction instruments.

2. **For Rescission** of the attorney–client business transactions and related agreements pursuant to Civil Code section 1689, on the grounds of undue influence, constructive fraud, failure of consideration, breach of fiduciary duty, and lack of informed consent.

3. **For Cancellation of Instruments** pursuant to Civil Code section 3412, canceling, expunging, and declaring void or voidable all grant deeds, deeds of trust, promissory notes, assignments of rents, powers of attorney, preliminary change of ownership reports, and related instruments affecting the subject properties (as specifically described in Exhibit A and/or ¶¶ 15, 31–35, and 137–141 of the Complaint), and directing the County Recorder to annotate or remove such instruments as necessary to clear title.

///

- 30 -

COMPLAINT

4. **For Quiet Title**, pursuant to CCP section 760.020, declaring that PLAINTIFF holds sole and superior title to the subject properties (as specifically described in Exhibit A), free and clear of any claim, lien, or interest asserted by DEFENDANT arising from the challenged transaction instruments.

5. **For Injunctive Relief**, preliminary and permanent, enjoining DEFENDANT from asserting, enforcing, recording, transferring, or relying upon any ownership, lien, rental, management, or control rights derived from the challenged transaction instruments.

6. **For the Imposition of a Constructive Trust** over any and all real property interests, rental income, loan proceeds, or other benefits currently held or controlled by DEFENDANT that were derived from or traceable to the challenged transaction instruments, with an order compelling reconveyance, accounting, and restitution to PLAINTIFF.

7. **For Compensatory Damages** pursuant to Civil Code section 3333 for all detriment proximately caused by DEFENDANT's tortious conduct, whether foreseeable or not, including but not limited to loss of property rights and equity, clouded title, lost contractual leverage and deposits, out-of-pocket payments, increased transaction and remediation costs, and other consequential damages according to proof.

8. **For Disgorgement and Forfeiture of Fees**, including total forfeiture and disgorgement of all legal fees, costs, retainers, and payments paid to DEFENDANT, as DEFENDANT's conflicted representation and breach of fiduciary duty render any fee agreement void as a matter of public policy under the *Sheppard Mullin* standard.

9. **For Special Damages Under the "Tort of Another" Doctrine**, including recovery of attorneys' fees, costs, and expenses incurred by PLAINTIFF in dealings with third parties—without limitation Select Portfolio Servicing, Clear Recon Corp., and Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust—necessitated by DEFENDANT's wrongful acts and omissions.

10. **For Punitive and Exemplary Damages** pursuant to Civil Code section 3294, in an amount to be determined at trial, as DEFENDANT acted with malice, oppression, and fraud by intentionally exploiting an attorney–client relationship for personal pecuniary gain at the expense of a vulnerable client.

11. **For Prejudgment and Post-Judgment Interest** as allowed by law.

12. **For Costs of Suit** incurred herein.

13. **For Such Other and Further Legal and Equitable Relief** as the Court deems just and proper.

///

///

///

COMPLAINT

**VERIFICATION**

I, **Luna D'Sol**, am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know its contents. The facts alleged therein are true of my own knowledge, except as to those matters that are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 13, 2026, at Palm Springs, California.

<u>/s/ Luna D'Sol</u>
**Luna D'Sol**
Plaintiff, In Pro Per
Email Address: jravada@icloud.com
2275 E Belding Dr
Palm Springs CA 92262
Telephone: 213-925-4069

- 32 -
COMPLAINT