LUNA D'SOL
Plaintiff, In Pro Per
Email Address: jravada@icloud.com
2275 E Belding Dr
Palm Springs CA 92262
Telephone: 213-925-4069

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUNA D'SOL<br>Plaintiff,<br><br>VS.<br><br>BANK OF AMERICA, N.A.;<br>BANK OF AMERICA CORPORATION;<br>TRICIA SHANKS, an individual;<br>PETER C MAXIM, an individual;<br>and DOES 1 through 50, inclusive,<br><br>Defendant(s). | **Case No:** 5:26-cv-03535-JGB-SP<br><br>**DECLARATION OF LUNA D'SOL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION**<br><br>Judge: Hon. Jesus G. Bernal.<br>. United States District Juge<br><br>Courtroom: 1, 2nd floor<br><br>Complaint Filed: March 4th, 2026<br><br>Concurrently filed with: Proposed Order, Ex Parte Application and Memorandum of Points and Authorities |

**DECLARATION OF LUNA D'SOL**

I, LUNA D'SOL, declare as follows:

1. I am the Plaintiff in the above-captioned action. I make this declaration based on my own personal knowledge of the facts stated herein. If called as a witness, I could and would testify competently to these facts.

**BACKGROUND**

2. I was employed by Defendant Bank of America Corporation. During my employment, I held multiple positions with the Bank, including positions involving management and, later, enterprise-level testing and complaints functions.

3. On May 21, 2025, while I was on an approved sick time, I received written notice concerning the termination of my employment. My employment subsequently ended effective June 20, 2025. I received my final pay check 3 days late and for the last month of work I as only paid a fraction of my salary.

**PURPOSE OF THIS DECLARATION**

4. I submit this declaration not to establish the validity or amount of my claim, but for the following limited and permissible purposes under USCS Fed Rules Evid R 408:

5. To demonstrate conduct by Defendant that I only recently discovered and of which I was previously unaware, and therefore could not have raised earlier, including alleged misrepresentations made during the course of settlement negotiations.

6. These communications are offered solely for these permissible purposes and not as proof of liability for the underlying claim.

7. I do not seek through this Declaration to invoke, assert, revive, or obtain adjudication of any claim concerning employee benefits, insurance benefits, severance benefits, or any severance agreement. Any reference to such matters is made solely to provide the factual context necessary for the limited purposes identified herein and is not offered as a claim for benefits, enforcement of any benefit or severance agreement, or determination of any rights arising thereunder.

8. I understand that the communications and documents described below arose in connection with settlement discussions. I do not submit them to establish the validity or amount of any underlying employment, discrimination, disability, leave, or other claim against Bank of America, nor to impeach any party through contradiction. I submit them for the limited purpose of establishing the sequence and circumstances surrounding the documents transmitted to me through my then-counsel, the identity and differences between the versions transmitted for execution, the circumstances surrounding my conditional execution of one version, and the subsequent transmission of a materially different version.

**ECF NO 26. DEFECTIVE FILING AND SUBSEQUENT BENEFIT TO DEFENDANTS**

9. I recently discovered that Defendants' counsel has misapplied filings on July 15, 2026, while I still lacked access to CM/ECF, I submitted my ex parte application through the Court's electronic submission system and separately served Defendants' counsel electronically, pursuant to their consent to electronic service.

10. That same day, after receiving my application but before the Court docketed it, Defendants filed ECF No. 26, 26-1, 26-2…26-10 PAGE ID 509 - 802, their opposition to my ex parte application, and ECF No. 27, a Certificate of Service representing that ECF No. 26 was served upon me via mail and by U.S. mail on July 15, 2026, The Certificate of Service further states, in substance, that service is defective if the postal cancellation date or postage-meter date is more than one day after the date of deposit stated in the certificate.

11. The physical package I received from Morgan Lewis was delivered on July 18, 2026. The mailing information on the package reflects July 16, 2026, at approximately 6:01 p.m, or one day after it purported to have been served (USPS Tracking 9534613159926197273985)

12. The package did not contain the opposition memorandum, supporting declaration or any other document identifying ECF No. 26, it contained of what is still today: PAGE ID 527-777. This is ECF Doc 26-3 except for its two first pages, effective appearing as if was the 250 pages from Notice of Removal being sent to Plaintiff as a second attempt. Notice that prior to sending these papers to

Plaintiff, Defendants' counsel scanned into the ECF record a second time resulting in the overlapping printed CM / ECF headers resulting in each page having no legible ECF Doc No.

13. Because I lacked CM/ECF access and the package did not contain the principal opposition papers, I had no way to determine from the materials I received that those documents had been incorporated into a new filing as part of ECF No. 26. My application was subsequently docketed on July 17, 2026, as ECF No. 32.

14. I discovered the circumstances surrounding ECF No. 26 only recently while auditing the docket and comparing ECF Nos. 26 and 27 with the physical documents actually delivered to me.

15. I discovered that Defendants had not merely filed a memorandum opposing my ex parte application. They also filed with that opposition another collection of documents, most of them duplicate filings, and exhibits, including documents concerning the Notice of Removal, service of the Motion to Compel Arbitration, my communications with Defendants' counsel, and other materials that had already appeared elsewhere in the litigation.

16. I also discovered that Defendants subsequently relied upon the ECF No. 26 versions of those materials in later substantive briefing. For example, in their August 3, 2026 Opposition to my Motion for Sanctions, ECF No. 60, Defendants cited ECF No. 26 generally and repeatedly cited ECF No. 26-2 and its exhibits in support of their factual assertions concerning service, tracking information, my July 6 communications, and other alleged litigation conduct.

17. Defendants also relied upon ECF No. 26 in support of serious accusations against me. ECF No. 60 alleged that I had made "false statements to the Court" concerning service and then relied, among other materials, upon ECF No. 26-2 and its exhibits in attempting to establish that accusation. 60.pdf Defendants further cited ECF No. 26-2 ¶6 and ECF No. 26-8, Exhibit 6 concerning my July 6 communication, and ECF No. 26-2 ¶¶7 and 10 and Exhibit 8 concerning other communications.

18. The practice continued in the accompanying August 3 declaration of Karen Cho. Cho expressly stated that my July 13 email had previously been filed as Exhibit 8 to her declaration opposing my ex parte application and directed the Court to "ECF No. 26-2, Exh. 8."

19. This created substantial confusion for me. Because I had not received the principal papers identifying the July mailing as Defendants' opposition and did not then have CM/ECF access, I did not understand that the materials I received had been incorporated into ECF No. 26. When Defendants later cited entries such as ECF No. 26-2, I knew that my objections were on the record but I did not know they had duplicated those filings and in that way obtained a clear unopposed argument.

20. On August 12, 2026, after discovering these issues, I contacted Defendants' counsel and requested a meet and confer concerning the docketing of ECF No. 26 et al.. I specifically requested that Defendants stipulate with me to seek correction of the docket so that their opposition would be properly associated with my ex parte application. Defendants did not respond to my request. A true and correct copy of my August 12, 2026 communication to Defendants' counsel is attached hereto as **Exhibit 75**

21. On August 17, 2026, I called Defendants' counsel and left her a voicemail to inform her about this ex parte filing. I also sent her another email advising her she has 48 hours to respond to my ex parte. A true and correct copy of my August 17, 2026 communication to Defendants' counsel is attached hereto as **Exhibit 76**

22. A true and correct copy of the USPS Tracking log for 9534613159926197273985 is attached here to as **Exhibit 77.**

23. Attached hereto as **Exhibit 78** is a true and correct photograph of the envelope in which I received the July 2026 mailing from Defendants' counsel. I personally took this photograph, and it fairly and accurately depicts the envelope as I received it, including the mailing label and postage information.

**CONFIRMED OMISSION OF DOCUMENTS FROM PRIOR PRODUCTIONS**

24. I do not present the matters below to reargue the merits of any wage claim or to seek adjudication concerning the amount of compensation owed to me. I identify the payroll-production history because it establishes that records I previously reported as missing were later produced by Defendants and assigned new Bates numbers. That history is relevant here because those same disputed

materials were subsequently reproduced or relied upon in connection with ECF No. 26 and later filings citing ECF No. 26. See ¶¶ 41–44, infra.

25. On December 5, 2025, Morgan Lewis transmitted payroll records to me on behalf of Bank of America and represented that the production included my payroll records for the preceding three years. The production consisted of BANK/LUNA0001 through BANK/LUNA0167.

26. The payroll sequence began at BANK/LUNA0001 with the pay period ending November 15, 2022, and ended at BANK/LUNA0159, which was the second page of the pay period ending June 15, 2025. Immediately thereafter, at BANK/LUNA0160, the production transitioned from pay slips to W-2 records and continued through BANK/LUNA0167, with my 2025 W-2 appearing at the end of the production. The organization and consecutive Bates numbering therefore gave the appearance that the payroll production was complete through its transition into the W-2 records.

27. A true and correct copy of selected pages from the December 5, 2025 payroll production is attached hereto as **Exhibit 79**, consisting of BANK/LUNA0001–0002 and BANK/LUNA0159–0167. These pages are provided to show the beginning of the pay slip sequence, the end of the produced pay slip sequence, and the transition from the pay slips to the W-2 records. Also Ms. Antonopolous letter that came in the package is included, in this letter she stated that the package contained a production for the last 3 years. Salary information has been redacted

28. The June 15, 2025 pay slip was not the final payroll activity reflected in the Bank's records. Additional payroll records existed for later periods, but those records were absent from the December 5, 2025 production. (supra ¶3)

29. The year-to-date wage and tax figures reflected on the final pay slip produced by the Bank did not match the year-end wage and tax figures reported on my 2025 W-2. Thus, the production itself reflected payroll activity beyond the last pay slip that had been provided to me.

30. I notified Defendants' counsel Nicole Antonopoulos in writing that the payroll records appeared incomplete. A true and correct copy of my December 9, 2025 email to Nicole Antonopoulos identifying the missing payroll records and requesting clarification is attached hereto as **Exhibit 80.**

31. On December 15, 2025, Nicole Antonopoulos provided an additional production. That production included three additional payroll pages bearing Bates numbers BANK/LUNA000168

through BANK/LUNA000176. Those pages had not been included in the December 5 production, which counsel had previously identified as my "payroll records dating back three years" and which ended at BANK/LUNA000167.

32. The sequential Bates numbering is significant to me because the additional payroll records did not replace or correct the numbering of the original production. Instead, the previously omitted payroll pages were assigned new Bates numbers beginning immediately after BANK/LUNA000167, the final Bates number of the earlier production. Thus, the later production confirmed that additional payroll records existed beyond the payslips contained in the original production.

33. The December 15 production was accompanied by a letter signed by Ms. Antonopoulos where she addressed me as "Mr. D'Sol." (emphasis added). A true and correct copy of the December 15, 2025 correspondence is attached hereto as **Exhibit 81**. The production also contained the following documents relevant to the matters described in this Declaration:

34. BANK/LUNA0178-0184: I present the following not to invoke, adopt, ratify, enforce, or seek benefits under the CSP Agreement, nor to contend that any release or waiver became effective, but solely to accurately describe the contents and condition of the documents Defendants produced to me as part of my personnel records. The first personnel record Ms. Antonopoulos included following the additional payroll records was a Severance Agreement that does not constitute an operative agreement between Bank of America and me. The document appears to be dated July 18, 2025 however its first page provides that it must be signed by July 8, 2025. Through the bank's GHR Ticket, 13911680, on September 23, 2025, the bank confirmed that they don't have records of a signed and returned douments. Also, I have obtained 5 personnel file versions, Ms. Antonopoulos is the only one that had a severance agreement. (infra ¶36)

35. BANK/LUNA0318-0323: The final document in Ms. Antonopoulos's production is the same Arbitration Policy that Mr. Bird previously provided to me. This copy bears a PDF creation date of February 26, 2025—the same date on which I disclosed that I was transgender to Defendants Shanks and Maxim, and one day before Defendant Shanks acknowledged my disclosure in writing.

36. A true and correct copy of GHR Ticket 13911680 is attached here to as **Exhibit 82** (supra ¶34).

**DEFICIENT PROOF OF SERVICES**

37. I present the following solely to identify an apparent chronological irregularity in the proof of service contained in Defendants' filings. The final page of that package is a proof of service corresponding to the document appearing at Tab 30 (ECF Doc. 1-4, pp. The document at Tab 30 bears Honorable Judge Manuel Bustamante's signature dated June 15, 2026. The accompanying proof of service, however, states that the document was served on me on June 10, 2025—five days before the date on which the document itself reflects that it was signed by Judge Bustamante.

**MISDATED PROOF OF SERVICE**

38. Defendants' proof of service accompanying the Notice of Removal states that the Notice was served on June 25, 2026. The mailing record, however, reflects that the mailing was returned to Defendants on June 27, 2026, after which Defendants mailed it to me again in the same envelope without preparing or providing an updated proof of service reflecting the subsequent mailing date. (ECF Doc. 31 Page ID 1047)

39. A similar date discrepancy appears in ECF No. 27, Defendants' proof of service relating to the document that was filed under their Motion to Compel Arbitration. That proof of service states that service occurred on July 15, 2026, whereas the mailing record reflects July 16, 2026.

**ALTERED PROOF OF SERVICE**

40. ECF No. 31, at pages 34, 37, 40, and 43, contains four proof of services for each NAR forms that I received by mail without signatures. Those pages reflect the condition of the NAR forms as I actually received them. Notwithstanding those unsigned copies, Defendants have repeatedly filed or produced versions of these proof of service forms bearing signatures throughout this action. As reflected at ECF No. 1, PageID #:76; ECF No. 10-5, PageID ##:307, 309, 311, and 313; ECF No. 26-3, PageID #:526; ECF No. 37-4, PageID ##:1144, 1146, 1148, and 1150; and ECF No. 37-5, PageID ##:1156,

1158, 1160, and 1162, signed NAR forms appear **14 times in the record** despite a forensic expert confirmed they were altered . ECF Docs. 64-9, 64-10

**PREJUDICE**

41. The table below summarizes one example of the prejudice created by the duplication and subsequent reliance described above. The dates, ECF numbers, and PageID references in the table are taken from the Court's docket and the filings identified therein. The table is provided as a demonstrative chronology to assist the Court in following the sequence of those filings.

42. As reflected above, the NAR originally appeared at ECF No. 1-3. On July 13, 2026, I expressly challenged that NAR in ECF No. 29, including its sufficiency and the evidence of statutory mailing. Misrepresentation_re_NAR_ECF37_Section.docx Two days later, Defendants placed another copy of the same NAR on the docket within ECF No. 26-3. The reproduced page retains the original ECF No. 1-3 filing header beneath the subsequently applied ECF No. 26-3 header.

43. On July 20, 2026, Defendants then relied upon the NAR issue in ECF No. 37. In doing so, Defendants expressly repeated my own phrase that the NAR was "unsupported by competent evidence of statutory mailing," characterized that contention as "irrelevant and baseless," and then stated that "Plaintiff does not dispute that she received the signed NAR in the mail."

44. This sequence was prejudicial to my ability to follow and respond to the record because the document I had already challenged existed again under a new ECF number within ECF No. 26, and Defendants subsequently relied upon the duplicated materials in later briefing. At the time, I did not understand that ECF No. 26 contained re-filed copies of materials that had already been the subject of my objections.

| Doc. | Filed | Page ID | Event |
|---|---|---|---|
| ECF 1- | 06/25/26 | #:76 | Original Notice and Acknowledgment of Receipt ("NAR") and Proc Service by Lilliam Quave filed as Exhibit C to the Notice of Remova |
| ECF 2! | 07/13/26 | #:822-823 | Plaintiff's Memorandum ISO Motion to Remand expressly dispute NAR as "facially frivolous, defective, unsupported by competent evidence of statutory mailing, and contradicted by Plaintiff's fore |

| | | | |
|---|---|---|---|
| | | | metadata evidence," citing forensic examination labeling the underlying email transmission "altered or replaced." |
| ECF 2( | 07/15/26 | #:602 (p. 7 253) | Defendants re-file the identical NAR Proof of Service as an exhibit their Opposition to Plaintiff's Ex Parte Application. The reproduce page header shows the original stamp bleeding through beneath new one: "Document 1-3 ... Filed 06/25/26 ... Page ID #:76" underly "Document 26-3 ... Filed 07/15/26 ... Page ID #:602." |
| ECF 3! | 07/20/26 | #:1114-11 | Defendants' Opposition to Motion to Remand states: "Plaintiff's contention that the NAR is 'unsupported by competent evidence statutory mailing' is similarly irrelevant and baseless... Plaintiff do not dispute that she received the signed NAR in the mail." |
| ECF 4! | 07/27/26 | #:1368-13 | Plaintiff's Reply ISO Motion to Remand rebuts the misrepresentat citing USPS tracking records establishing that the original mailing returned and re-mailed, and that Defendants never corrected the Certificate of Service after being notified of the discrepancy. |

Table 1

**RESULTING HARM**

45. I present the foregoing communications for the limited purpose of explaining their practical effect on my ability to obtain replacement counsel. Bank of America informed me that Sack & Sack LLP had asserted an interest in any potential recovery, which I refer to herein solely for convenience as the **"Claimed Interest."** Bank of America continued to recognize and reinforce the Claimed Interest as an obligation affecting any potential recovery, while providing me inconsistent amounts attributed to it and without providing me the underlying communication upon which it stated it was relying. In addition, communications through which the Bank conveyed information concerning the Claimed Interest were repeatedly designated "For Settlement Purposes Only." This further complicated my ability to provide prospective counsel with the information necessary to independently evaluate the nature, amount, and potential effect of the Claimed Interest. As a result, I was unable to provide prospective attorneys with either the underlying communication or a definitive and consistently stated

amount from which they could independently evaluate the claimed obligation. These circumstances materially impaired my ability to obtain replacement representation.

46. I recognize that I am appearing without counsel and do not possess the training, experience, or institutional resources available to Defendants and their counsel. I respect the role of Defendants' counsel and do not suggest that my pro se status excuses my obligation to comply with the applicable rules and orders of this Court. I would prefer to be represented by counsel. I identify the circumstances described in this Declaration because several of the procedural difficulties I encountered did not arise in isolation: they occurred while I lacked CM/ECF access and while Defendants, represented by experienced counsel, controlled the preparation, filing, service, and subsequent use of documents that I was attempting to understand and address without counsel.

47. I therefore do not ask the Court to disregard errors merely because I am self-represented. I ask only that my procedural mistakes be considered in the context of the record described above, including the discrepancies in service and document production, the duplication and subsequent use of filings, my efforts to raise and resolve those issues when I discovered them, and the circumstances that have materially impaired my ability to obtain replacement counsel. My purpose is not to diminish the professional standing of opposing counsel, but to ensure that procedural irregularities or confusion do not operate to my prejudice merely because I lacked equivalent legal representation and access to the same litigation resources.

**PURPORTED LIEN**

48. In or about June 10th 2025, I retained Sack & Sack LLP for the limited purpose of representing and assisting me in connection with settlement discussions with Bank of America.

49. On July 17, 2025, I received an email from Sack & Sack LLP transmitting an amended agreement that had been provided in connection with those discussions. A true and correct copy of the July 17, 2025 email is attached hereto as **Exhibit 83**. A true and correct copy of the agreement transmitted with that email, with confidential or otherwise protected information redacted, is attached hereto as **Exhibit 84.**

50. I signed the agreement transmitted to me and included a written statement memorializing my understanding of a matter that had previously been discussed and agreed upon: the reopening of my medical benefits. I reference that subject here only as part of the chronology and circumstances surrounding the documents exchanged. I do not seek through this Declaration to assert, enforce, revive, or obtain adjudication of any claim for medical or insurance benefits or any rights under a benefit or severance plan.

**51.** On the day after, July 18, 2025, I received another email from Sack & Sack LLP informing me that I had signed the wrong version of the agreement. A different version was attached to that email, and I was instructed to sign that version. The communication did not identify or explain to me any material differences between the version previously transmitted to me and the replacement version. A true and correct copy of the June 18, 2025 email is attached hereto as **Exhibit 85**. A true and correct copy of the replacement agreement transmitted with that email, with confidential or otherwise protected information redacted, is attached hereto as **Exhibit 86.**

**52.** After subsequently comparing the two versions, I identified differences between the agreement first transmitted to me and the replacement agreement I was subsequently instructed to sign. To permit the Court to review those differences without requiring disclosure of unrelated portions of the agreements, I prepared a page-by-page comparison identifying the relevant differences between the two versions. That comparison is attached hereto as **Exhibit 87.**

53. On July 18, 2025, at approximately 9:40 p.m., after I objected to the revised Addendum and raised concerns regarding the changes made to the agreement, Jonathan Sack sent me a lengthy email in which he responded to my objections with a series of personal and disparaging remarks concerning me.

54. Among other statements, Sack characterized one of my asserted losses as "phony," described my position concerning front pay as "ludicrous," accused me of making "unheard-of claims," stated that it had "always been about the money" for me, and told me "shame be on you." He further characterized my legal positions and AI-assisted communications as "silly," "pathetic," "dumb," and "nonsense," and asked rhetorically, "Who do you think your audience is, a bunch of dummies?"

55. In the same communication, Sack addressed what would occur if I rejected the proposed agreement or terminated his firm's representation. He stated that his firm claimed an interest of $197,825; that replacement counsel would have to pay that amount from any proceeds before I or replacement counsel received payment; and that, if I terminated the firm, he would notify Bank of America of the claimed interest. He further stated that, unless I advised otherwise, he would inform Bank counsel of my rejection and that he was "quite certain they will take the deal off of the table. For good."

56. A true and correct copy of Jonathan Sack's July 18, 2025 email is attached hereto as **Exhibit 88.**

57. Based on the communications and circumstances described above, I concluded that Sack & Sack LLP could no longer represent my interests in a manner consistent with what I understood our limited-scope representation to require. Pursuant to my retainer agreement, I terminated Sack & Sack LLP's representation.

**BANK OF AMERICA'S REINFORCES LIEN WITH INCONSISTENT AMOUNTS WHILE REFUSING TO PROVIDE A COPY**

58. I contacted Stephen D. Bird, Associate General Counsel and Senior Vice President, Global Human Resources Legal at Bank of America, and informed him that Sack & Sack LLP no longer represented me and that I would be representing myself in my communications with Bank of America.

59. On July 24, 2025, at approximately 7:35 a.m., Stephen D. Bird sent me an email designated "Confidential – For Settlement Purposes Only." Bird informed me that, on July 22, 2025, Bank of America had received written notice from Jonathan Sack asserting an interest in the amount of $197,825. Bird further informed me that Bank of America would not disregard the claimed interest unless I either produced a court order resolving the matter or resolved the dispute with Sack. Bird stated that, with respect to the Bank's final settlement offer, $197,825 would be carved out and held pending resolution of the matter between Sack and me. A true and correct copy of the email I

received from Stephen Bird, with confidential or otherwise protected information redacted, is attached hereto as **Exhibit 89.**

60. Later that same day, on July 24, 2025, at approximately 2:54 p.m., I received a second email from Stephen D. Bird, designated "Confidential – For Settlement Purposes Only." Bird stated that if I wanted to proceed the bank will hold $175,000 for legal fees to Sack and Sack LLP. A true and correct copy of the email that I received from Stephen Bird, with confidential or otherwise protected information redacted, is attached hereto as **Exhibit 90**.

61. I noticed that Bird had used two different lien amounts in one day

62. On July 28, 2025, Stephen D. Bird sent me an email stating that I was bound by Bank of America's Arbitration Policy and attaching a copy of the policy. A true and correct copy of Bird's July 28, 2025 email was previously filed at ECF No. 31, Exhibit 2, PageID 929. A true and correct copy of the Arbitration Policy Bird attached to that email was previously filed at ECF No. 31, Exhibit 3, PageID 931–936.

63. After receiving the Arbitration Policy from Bird, I examined the electronic file and observed that its metadata reflected a creation date of February 27, 2025. That date was significant to me because it was the same date on which Bank of America acknowledged my February 26, 2025 disclosure that I was transgender.

64. I brought the February 27, 2025 metadata date to Bird's attention and transmitted the metadata information to him. A true and correct copy of the metadata information I transmitted to Bird was previously filed at ECF No. 31, Exhibit 4, PageID 938–939.

65. Bird responded to my inquiry and explained, in substance, that the document he had provided was an "exemplar." A true and correct copy of Bird's response was previously filed at ECF No. 31, Exhibit 5, PageID 941.

**MORGAN LEWIS REINFORCES LIEN WITH INCONSISTENT AMOUNTS WHILE REFUSING TO PROVIDE A COPY**

66. By August 6, 2025, attorney from Morgan, Lewis & Bockius LLP Grant MacQueen was communicating with me concerning my dispute with Bank of America. On August 6, 2025, I receive an email from MacQueen designated as "PRIVILEGED & CONFIDENTIAL: FOR SETTLEMENT PURPOSES ONLY." Mcqueen stated that I could accept the offer which will reinstate in healthcare reinstatement, and that under this arrangement $175,000 will go towards attorney's fees. A true and correct copy of the email that I received from Grant MacQueen on August 6, 2025, with confidential or otherwise protected information redacted, is attached hereto as **Exhibit 91**.

67. On August 19, 2025, MacQueen sent me an email stating that the purported lien is for $197,825 and also refused to provide me a copy. A true and correct copy of the email that I received from Grant MacQueen on Augut 19, 2025, with NO confidential or otherwise protected information, is attached hereto as **Exhibit 92**.

**UNMATCHED PRIORITIES**

68. At the time, Bank of America was treating a purported lien as an impediment to releasing settlement proceeds, although I had not been provided a copy of the underlying lien communication that the Bank stated it had received.[1]

69. My principal concern during this period was not avoiding payment of attorney's fees. I repeatedly sought the restoration and continuation of my healthcare coverage because I had recently been diagnosed with HIV and had gender-affirming surgery scheduled for the following month. Maintaining uninterrupted healthcare coverage was therefore of immediate importance to

[1] The significance of these figures is not merely that they changed, but that the amounts reflected in the Bank's documents and Sack's communications **moved in parallel**. On July 8, Bank of America's Addendum reflected **$200,000** for attorney's fees; on July 9, Sack identified his fee as **$197,825.52**, and on July 11 as **$197,825**. When the Bank's July 18 revised Addendum reduced the attorney-fee allocation to **$175,000**, Sack likewise described **$175,000** as his fee concession from $197,825. Yet, in the same period, Sack continued to assert entitlement to **$197,825**, subsequently communicated a **$197,825 lien** to the Bank, and on July 24 stated that his firm's earned fee remained $197,825. That same morning, Bank in-house counsel Stephen Bird stated that **$197,825** would have to be carved out and held because of Sack's lien. The documentary sequence therefore reflects that the Bank's treatment of the attorney-fee allocation and Sack's asserted fee repeatedly **rose, fell, and returned to substantially the same figures during the same periods**. I offer this chronology as evidence from which the Court may evaluate whether those parallel changes resulted from communications or coordination between the Bank and Sack; I do not rely on the numerical changes alone as proof of such coordination.

me. My dispute with Sack arose, among other things, after I discovered that a material change affecting the healthcare protection I had sought to preserve was contained in the revised agreement but had not been disclosed or explained to me before I was instructed to sign the replacement version.

70. A true and correct copy of a letter dated August 26, 2025, from my primary treating physician, Dr. Jason Halperin, is attached hereto as **Exhibit 93**. In that letter, Dr. Halperin stated:

> "I am a licensed physician in the State of California specializing in infectious disease. I am the treating physician for Luna Dol. Luna was diagnosed with HIV in March 2025. Due to interruption in treatment, this condition substantially endangers Luna's health. In my professional opinion,it is essential that my patient have access to medical insurance to cover her life saving medication. If you have any questions please don't hesitate to contact me."

71. On or about July 1, 2025, my medical insurance coverage was terminated. Following the loss of coverage, my scheduled gender-affirming surgery was canceled, my hormone treatment was interrupted, and I experienced a reversal of physical changes that had occurred during my transition. My access to HIV medication was also disrupted, and because I did not have uninterrupted access to replacement medication, I rationed the medication available to me for a period of months.

72. During this period, I attempted to obtain legal representation. In communicating with prospective attorneys, I encountered substantial difficulty finding counsel willing to take my case. Several attorneys explained to me that they were unwilling to undertake the representation while an unresolved lien of uncertain amount potentially affected any recovery, because they viewed the uncertainty surrounding the lien as a financial risk associated with taking the case. (See July 15, 2025, third party counsel declining representation because of the line ECF Doc 31 Page ID 1056)

73. **I have the utmost respect for this Court and for the judicial process. I hold a master's degree from a postgraduate institution; however, I am not legally trained. Even with my educational background, I do not consider myself adequately equipped to challenge experienced counsel on equal footing in matters involving federal procedure, evidentiary rules, and complex motion practice.**

74. **I expressly reserve all rights, claims, defenses, objections, and arguments not necessary to resolution of this Application. Nothing in this Application, the accompanying Declaration, memorandum, or my decision not to fully brief matters outside the narrow relief presently requested shall be construed as a waiver, abandonment, concession, or forfeiture of any substantive or procedural position, including any argument concerning the existence, formation, validity, enforceability, scope, or applicability of any purported arbitration agreement; the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"); the sexual-harassment allegations pleaded in my Complaint; or the arbitrability of those allegations or of the action as a whole. I do not request adjudication of those matters through this Application and expressly preserves them for determination through an appropriate procedural vehicle and on a complete record**

I declare to the best of my knowledge under penalty of perjury under the laws of California and the United States that the foregoing is true and correct.

Executed on August 18, 2026, at Palm Springs, California.

**/s/ Luna D'Sol**

**Luna D'Sol**
Plaintiff, In Pro Per